## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTRAL AMERICAN BANK FOR ECONOMIC INTEGRATION (CABEI) Boulevard Suyapa, Tegucigalpa, Francisco Morazán, Honduras<br><br>*Plaintiff*,<br><br>v.<br><br>DANTE MOSSI, 2600 Pennsylvania Ave NW, Apt 401-4D Washington, DC 20037<br><br>*Defendant*. | Civil Action No. 1:24-cv-2544-CRC<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## I. INTRODUCTION

1.      This case involves a fraudulent and extortionate scheme perpetrated against Plaintiff Central American Bank for Economic Integration ("CABEI" or the "Bank") by its former Executive President, Dante Mossi. Mossi engaged in this scheme to enrich himself through his position at CABEI and in an attempt to extort a large and unearned payment from CABEI after it made the ordinary, good-faith decision not to renew his term as Executive President. Not only did Mossi abuse the Bank's position and resources to misappropriate the Bank's business opportunities and create a lucrative exit opportunity for himself, but since leaving the Bank, he has engaged in an unlawful and corrupt crusade against CABEI, falsely disparaging it, attempting to damage its business and reputation and relationships in the United States, and violating his confidentiality obligations to the Bank—all in an attempt to extort from CABEI millions of unearned dollars. Mossi also admitted, in a radio interview, that his relevant actions were *intended* to target the United States. And his scheme reached CABEI's U.S. business partners and contacts, involved

meetings held in the United States, used U.S. wires and mail, and caused CABEI significant injury in the United States. CABEI therefore brings this action to recover the damages it has suffered due to Mossi's illegal scheme and to protect itself from further harm. CABEI seeks monetary damages, equitable relief, and a declaratory judgment.

2.      CABEI promotes economic integration and economic and social development in Central America through the provision of loans and financing to member countries. CABEI invests in projects that foster development, reduce poverty and inequality, and promote environmental sustainability in the region, as well as strengthen the competitive positions of its member countries in the global economy. Consistent with its mission, CABEI is a multilateral institution. Its member countries appoint a Board of Governors, which elects an Executive President to run the organization. Each Executive President has a five-year term, with the option for one renewal.

3.      Defendant Dante Mossi is a Honduran national domiciled in the District of Columbia, where he worked for the World Bank before being elected as CABEI's Executive President for the term beginning on December 1, 2018. In May 2023, after a tumultuous first term, CABEI's Board of Governors voted unanimously not to renew Mossi's five-year term. That vote was consistent with CABEI's historic practice—indeed, in 60 years only two Executive Presidents served more than one term. And it reflects concerns the Board had about the quality of his leadership and character.

4.      Though consistent with CABEI's historical practice, the Board's vote enraged Mossi. Ever since, Mossi has waged an unrelenting campaign of extortion against CABEI. He has made it his mission to attack CABEI and harm its ability to do business, in particular with its U.S. partners. He has engaged in a social media campaign that includes publishing false statements about CABEI nearly every day, largely aimed at the U.S. market. He has also engaged in a pattern

of false and misleading statements specifically targeted to CABEI's U.S. business partners and the investing public in order to try to force CABEI to buy his silence.

5.      As part of this scheme, Mossi repeatedly threatened to file—and has now filed—sham legal proceedings against CABEI demanding millions of dollars in damages to which he is not entitled. Specifically, on July 1, 2024, Mossi filed a demand with the Central American Court of Justice ("CCJ") seeking over $2.5 million from the Bank based on frivolous claims of defamation and a few thousand dollars in personal legal fees for which Mossi wrongly claims CABEI was required to reimburse him. Mossi has also attempted to use the web of contacts in Latin American governments that he largely developed while at CABEI to incite bogus investigations of CABEI by authorities in Costa Rica, among other countries. But CABEI has committed no wrongful acts, something of which Mossi, as its former Executive President for five years, is well aware. Instead, Mossi is attempting to interfere with CABEI's mission, damage its standing in the marketplace, and increase its costs to do business.

6.      Mossi's message is clear. His attacks against the Bank will not stop until the Bank pays him a large and unearned settlement. Through extortion, Mossi hopes to obtain property to which he is not entitled. Specifically, he wants CABEI to pay him millions of dollars to buy both his silence and an end to his attempts to interfere with CABEI's business. Mossi has therefore committed multiple violations of the Hobbs Act through these attempted acts of extortion.

7.      But Mossi's bad conduct does not stop there. While still at the Bank, Mossi abused his position and CABEI's resources to misappropriate CABEI's business opportunities and build a lucrative exit ramp for himself. CABEI has long promoted and been involved in ESG initiatives and, in keeping with that, had been exploring ways to expand infrastructure supporting use of electric vehicles in member countries. While serving as Executive President, Mossi took advantage

of this to misappropriate CABEI's business opportunities for himself. By way of example, Mossi used the Bank's resources to sponsor an electric vehicle ("EV") conference in Washington, D.C., to generate business opportunities for himself. Even as CABEI was attempting to cultivate relationships with U.S. EV manufacturers, including Detroit-based automakers and Tesla, Mossi instead used his position and the conference to cultivate a relationship with Cenntro Electric Group ("Cenntro"), an EV company headquartered in New Jersey, and Blink Charging Co., an EV charging station company headquartered in Maryland. Why? To enrich himself.

8.    Shortly before his departure, Mossi abused his office to benefit himself and Cenntro by causing the Bank to purchase two EVs from Cenntro with no apparent business rationale. He then used the Bank's resources to negotiate and broker a deal for a Honduran taxi company to purchase Cenntro vehicles for its fleet. Weeks later, when he left CABEI, he immediately incorporated a new company—Soluciones de Movilidad Eléctrica de Centroamérica ("SOLMECA")—that has since opened its headquarters in Tegucigalpa and has or will directly benefit from the Honduran taxi deal he had negotiated while serving as Executive President of and fiduciary duty to CABEI, as well as more generally from the relationships with Cenntro and Blink that Mossi pursued purportedly on behalf of the Bank, but really on his own behalf. As explained in further detail below, Mossi committed multiple acts of wire fraud and mail fraud in order to further this scheme and violated his fiduciary obligations to the Bank by holding out the promise of Bank investment to secure this lucrative exit opportunity for himself, all at the expense of CABEI's business relationships with other U.S.-based EV companies. In short, Mossi has engaged in a pattern of racketeering in the operation of this enterprise—an association in fact between himself, Cenntro, and SOLMECA—and these predicate acts have a singular goal: to enrich himself at CABEI's expense and to CABEI's detriment, both in the U.S. and abroad.

9. Faced with Mossi's vexatious, harassing, and extortionate campaign, CABEI was forced to bring this action to enjoin Mossi's interference with CABEI and its business relationships, and to seek damages for the harm his statements and actions have caused. Mossi has violated the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute, the Manipulation of Market statute in D.C., has committed tortious interference with prospective business relations, and has breached his fiduciary duties and his contracts—all causing CABEI harm, and particularly harming CABEI's critical business relationships and interests in the United States. CABEI filed this action to hold him accountable.

10. In response, what did Mossi do? He refused to accept responsibility. He doubled down. On November 18, 2024, Mossi moved to dismiss, arguing that this Court lacks personal jurisdiction, among other arguments. To support his motion, Mossi filed a declaration about his supposed lack of ties to the U.S. that includes multiple false statements. Among other things, Mossi stated that he has as not resided in Washington, D.C. since 2018 and that, on average, since his departure from the World Bank, he has spent less than 30 days per year in the United States—all for medical reasons. In fact, government records prove Mossi has spent on average months' worth of time in the United States every year since 2019. Indeed, when CABEI sent a process server to his D.C. apartment to serve the Complaint, it was *Mossi's* phone that rang when the server pushed the doorbell, and it was *Mossi* who answered. Mossi listed his D.C. apartment as his home address in a job application he filled out near the end of his time at CABEI. There is no serious question that this Court's exercise of personal jurisdiction over Mossi, whose ties to D.C. and the surrounding area go back over a decade, comports with due process. Mossi's attempt to obscure his systematic and continuous contacts with the United States only confirm that his assault on CABEI, and his practice of misconduct, lies, and racketeering must end. Plaintiff therefore files

this First Amended Complaint, again seeking damages, injunctive relief, and a declaratory judgment.

## II. PARTIES

11.     Plaintiff CABEI is a regional development bank with headquarters in Tegucigalpa, Honduras and regional offices in each Central American member state. CABEI sells bonds to U.S. investors and has many business relationships in the U.S.

12.     Defendant Dr. Dante Mossi is a Honduran national domiciled in Washington, D.C.

13.     From December 1, 2018 to November 30, 2023, Mossi served as the Executive President of CABEI.

## III. JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because CABEI asserts a claim under 18 U.S.C. § 1962(c).

15.     The Court has subject matter jurisdiction over CABEI's state law claims pursuant to 28 U.S.C. § 1367 because these claims arise out of the same case or controversy as the Bank's federal law claim, as all claims in this action arise out of a common nucleus of operative facts.

16.     This Court has general personal jurisdiction over Mossi, who is domiciled in Washington, D.C., pursuant to D.C. Code § 13–422. In the alternative, the Court may exercise specific jurisdiction over Mossi pursuant to D.C. Code § 13-423(a)(1), (3), and (4), 18 U.S.C. § 1965(d), Federal Rules of Civil Procedure 4(k)(1)(A), 4(k)(1)(B), or, in the alternative, 4(k)(2).

17.     Since as early as 1993, Mossi has continuously maintained home addresses and mailing addresses in various states across the United States. On information and belief, Mossi purchased a home in Henrico, Virginia in 2012 with his sister, Karla Mossi. On information and belief, Mossi and his family later founded a family business—the Mossi Group—in 2014 and

conducted business until at least 2015. The company listed a mailing address in Richmond, Virginia, which Mossi has used as a mailing address.

18.     As early as 2016, Mossi established permanent roots in Washington, D.C. when he served as the Senior Operations Officer in the Global Energy Practice (Africa) for the World Bank in Washington, D.C. from 2016 to 2018. On information and belief, Mossi continues to receive income from D.C. source through his pension from the World Bank.

19.     On information and belief, in September 2016, Mossi purchased a home on Pennsylvania Avenue in Washington, D.C., which he continues to own.

20.     Mossi maintained his home on Pennsylvania Avenue after his position with the World Bank ended in late 2018. Since then, he has regularly referred to his apartment in D.C. as his "home address" and he continued to pay for utilities at the apartment well into the time period Mossi now claims he began living in Honduras. And contrary to his claim not to have resided in D.C. since 2018, when applying for new positions towards the end of his tenure with CABEI, he listed his Pennsylvania Avenue address as his home address and a U.S. cell phone number as his contact information. When process servers went to serve CABEI's original Complaint in this action at his Pennsylvania Avenue apartment, the doorbell rang directly to his cell phone. Mossi answered the call (though he refused to accept service).

21.     As he admits, Mossi regularly travels back to the United States, particularly to Washington D.C., and has every intent of continuing to do so. What Mossi does not admit is the frequency, duration, and purpose of those trips. Information contained in U.S. government records available from the Department of Homeland Security contradicts Mossi's sworn statements. For example, those records reflect that Mossi made at least 13 trips to the United States in 2019, staying for 62 days; at least two trips in 2020 (an anomaly presumably caused by the COVID-19

pandemic), staying for 23 days; at least five trips in 2021, staying for 137 days; at least 11 trips in 2022, staying for 56 days; at least 13 trips in 2023, staying for 60 days, and at least six trips in 2024 to date, staying for 53 days. That is an average of 65 days per calendar year (and an average of nearly 74 days / year excluding COVID-restricted 2020), which is more than double (even triple) the number of days per year Mossi falsely claims in his sworn declaration to have spent in the United States since his departure from the World Bank.

22.     While Mossi claims he only travels to D.C. for medical reasons, the frequency, duration, and location of his visits suggest otherwise, as do the contents of his social media posts. Mossi appears to have spent most of this time in D.C. and surrounding areas including Virginia, but he has also traveled to Miami and California (including in connection with his business deals with Cenntro), posting photos on social media showing himself engaged in a number of everyday activities. Mossi's claim that his visits were "all for medical reasons" is therefore false. Indeed, on November 4, 2024, Mossi himself stated he traveled to Ontario, California, to "[v]isit[] an electric vehicle factory!"—not for a doctor's appointment.

23.     On information and belief, Mossi also does business and holds bank and credit card accounts with financial institutions in the United States, in particular Citibank. On information and belief, he also has a home mortgage from Citibank.

24.     Mossi executed one of the contracts that CABEI seeks to enforce in this action, the Certificate of Acceptance, in Washington, D.C. on October 10, 2018.

25.     Mossi regularly made and continues to make false, misleading, and defamatory statements about CABEI and its business, detailed explicitly below, which Mossi knows and intends to have harmful and disruptive impacts on CABEI's business throughout the United States, and in Washington, D.C., in particular.

26.     Mossi efforts while at CABEI to expand electric mobility were explicitly aimed at the United States. In an email to himself dated August 12, 2021, Mossi said "[g]reening the transport sector could be done in the short term. Better access to the US market is essential, most offers for electric and hybrid cars is coming from China - while Taiwan is a partner of CABEI. We are fielding a mission to the US to bring US carmakers attention to Central America, such as Proterra, GM, Ford and Toyota"—all U.S.-based companies.

27.     Mossi also violated the terms of his employment with CABEI and breached his fiduciary duties to the Bank by dedicating CABEI funds to hosting a conference or "business forum" in Washington, D.C. on November 21, 2022, ostensibly about promoting electric mobility in Central America but primarily designed to promote Cenntro, a U.S.-based EV company, headquartered in Freehold, New Jersey and with manufacturing facilities in the United States. Mossi subsequently misused Bank assets to fund the purchase of products from Cenntro, and then organized business deals for Cenntro that he then appropriated for his own benefit when he left the Bank.

28.     On October 17, 2024, Radio America Honduras interviewed Mossi about his tenure at CABEI, as well as his CCJ demand and this action. Mossi claimed in the interview that his interactions with Cenntro were aimed at strengthening CABEI's connections with the United States and securing better opportunities for the Bank. Specifically, he said, "it is absurd because I tried to bring Central America very close to the United States because we have total free trade, [they are] our biggest partner. We have to talk more with the United States. I wanted to open us to what the United States has." In short, Mossi admitted that his interactions with Cenntro, which are at the heart of CABEI's claims, and which he ostensibly undertook to benefit the Bank, but which

he really undertook to create business opportunities for himself were specifically aimed at the United States.

29.     Venue for this action is proper pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391.

## IV.  FACTUAL ALLEGATIONS

### A.    CABEI Background

30.     CABEI is a regional development bank that was established in 1960 by five founding members states: Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica ("Founding Members"). There are currently 15 member countries.

31.     The Bank offers its member countries a variety of financial instruments and methods of financing regional development. For public sector development, CABEI offers member countries opportunities to access direct loans, co-financed loans, credit lines for central banks, development operations, and technical cooperation. For private sector development, CABEI offers similar loan programs but includes structured loans, financial guarantees, and public-private partnerships.

### B.    CABEI's Organizational Structure

32.     The Board of Governors is CABEI's highest authority. Pursuant to CABEI's Constitutive Agreement, each member country is represented by one titular governor and one alternate governor on the Board of Governors. The votes of the Founding Members have the power to constitute a majority in any vote. All of the Bank's powers are vested in the Board of Governors, which delegates responsibilities to the Board of Directors, a permanent body responsible for the Bank's management. The Executive President reports directly to the Board of Directors.

33.     Pursuant to CABEI's Constitutive Agreement, the titular governors of the Board of Governors elect the Executive President every five years. Six months prior to the end of the

Executive President's five-year term, the Board of Governors votes on whether to renew the term of the Executive President or open the position to a new candidate. An Executive President may be reelected one time only. Only two Executive Presidents have served two terms in the 60-year history of the Bank.

34.    If the Board declines to reelect the current Executive President, the Board of Governors chooses a new Executive President from a list of three candidates selected based on an international search conducted by the Board of Directors with the help of outside consultants.

35.    The Executive President is the highest-ranking official in the Bank's administrative management. The Executive President is responsible for the administration of the Bank under the direction of the Board of Directors and is not permitted to hold any other jobs or offices during his or her term.

36.    Pursuant to the terms of the Constitutive Agreement, the Executive President must comply with CABEI's operative Constitutive Agreement, the Bank's regulations, and the decisions of the Board of Governors and the Board of Directors. The Executive President owes fiduciary duties entirely to the Bank—including duties of loyalty and care—according to the terms of CABEI's Constitutive Agreement.

**C.    The Board Elects Mossi as President of CABEI for a Five-Year Term from December 1, 2018 to November 30, 2023**

37.    In 2018, Mossi was among the three candidates for Executive President presented by the Board of Directors to the Board of Governors. Mossi had served as the Senior Operations Officer in the Global Energy Practice (Africa) for the World Bank in Washington, D.C. from 2016 to 2018. Before that, he had spent 13 years in various World Bank positions. And prior to that, from 1998 to 2002, he served as the Secretary Commissioner at the Honduran National

11

Telecommunications Commission. On paper, therefore, Mossi had the requisite credentials to serve as CABEI's Executive President.

38.    On or around October 1, 2018, the Board of Governors of CABEI elected Mossi to serve as CABEI's Executive President. He assumed that role two months later.

39.    In connection with his appointment, Mossi signed an agreement titled Pledge of Loyalty and Confidentiality in Washington, D.C. on October 10, 2018. In that agreement, he agreed to:

    a.   "fulfill my obligations to the best of my ability, in a manner that helps achieve the purposes of the Central American Bank for Economic Integration (CABEI)";

    b.   "refrain from disclosing confidential information to persons outside the Bank";

    c.   "not use information that I become aware of due to my position for my personal gain";

    d.   "not accept instructions in the performance of my duties and responsibilities from any Government or Authority other than the CABEI"; and

    e.   "adhere to all of the Bank's Confidentiality rules as set forth in the General Regulations for Human Resources Administration and its other complementary Manuals that are being provided to me" (emphasis removed).

40.    Mossi was fully aware of and later would acknowledge that this confidentiality agreement was binding and enforceable.

12

41.    Mossi's employment was also contingent on his adherence to a Code of Ethics and other related employment policies and procedures. Among these were the Bank's Complementary Regulations and Procedures of the Code of Ethics. Mossi executed the Code of Ethics in D.C. on October 10, 2018.      Article 3 of that Code states that "all the Bank's personnel . . . are bound to comply with the principle of confidentiality" with respect to information classified as "confidential or restricted for internal use" or that they "generate during their work relationship with the Bank." Pursuant to that binding Code of Ethics, "the obligation of confidentiality of the information shall subsist for up to ten years after the termination of [his] relationship" with the Bank.

42.    CABEI's Code of Ethics also established that its employees owe the Bank a duty of loyalty, confidentiality, transparency, and cooperation. CABEI's duty of "loyalty and confidentiality" means that employees are required to show commitment and faithfulness towards CABEI and all other employees, foster a positive institutional image through their actions, avoid comments that potentially damage the Bank, and behave in a discrete manner that prioritizes the confidentiality of the Bank's information.

43.    Further, the Code of Ethics contains a conflict of interest policy that requires employees, including the Executive President as the highest-ranking official in the Bank's administrative management, to disclose all relevant potential conflicts of interest and to refrain from making decisions that implicate any such conflict.

44.    The Code of Ethics also explicitly requires that employees refrain from retaliating against Bank employees, customers, or suppliers or engaging with clients or funding sources in ways that contravene the Bank's interests.

**D.    Mossi Uses His Position at the Bank to Promote a Private Company: Cenntro Electric Group**

45.     During his tenure as Executive President, Mossi was a volatile leader who alienated the Board of Governors and the Board of Directors. He engaged in a steady stream of misconduct that breached his contractual obligations and fiduciary duties—including a disturbingly corrupt pattern of self-dealing and self-serving activity that violated his duty of loyalty to CABEI.

46.     While he was serving as Executive President, Mossi developed a personal business relationship with an EV start-up, Cenntro. Cenntro is an electric vehicle ("EV") company incorporated under the laws of the state of Nevada, and with headquarters in Freehold, New Jersey. While Cenntro has manufacturing facilities in China, it also has manufacturing facilities in the U.S., and its vehicles are assembled in the U.S. Cenntro is listed on the NASDAQ and is certified by the U.S. Department of Energy. Mossi's relationship with Cenntro began at CABEI, with the use of CABEI's resources and business cachet. Specifically, as part of its ongoing initiatives in the ESG space, CABEI sought to expand EV infrastructure throughout the region. The logical way to pursue these initiatives was to establish relationships with U.S.-based EV makers.

47.     The U.S. has become a hub for EVs due to a series of favorable laws and regulatory incentives. In 2009, President Obama's administration created a tax credit of up to $7,500 for new EV purchases. The Inflation Reduction Act of 2022 incentivized investments in and set aside funding for clean energy and EVs, creating an environment conducive to the growth of the EV sector. Many EV companies, including Tesla, and Detroit-based automakers, have succeeded in U.S., rather than in China or elsewhere, due to these domestic regulatory incentives and other favorable conditions.

48.     CABEI sought to capitalize on these favorable conditions by establishing relationships with U.S.-based EV companies, such as Tesla and Detroit-based automakers. On

August 12, 2021, Mossi wrote a note to himself about CABEI's EV initiatives in the region in August 2021, noting that "[b]etter access to the US market" by CABEI was "essential" to "[g]reening the transport sector." He noted that CABEI was "fielding a mission to the US to bring US carmakers attention to Central America, such as Proterra, GM, Ford and Toyota," and that CABEI was "buying eight electrical buses for each country in the region, and deploying lines of credit to car dealerships to transform the car fleet to hybrid and electric."

49.     CABEI worked to forge relationships in the EV sector by conducting business meetings with domestic EV producers across the United States, including several Detroit-based automakers and Tesla. For example, in August of 2021, CABEI personnel, including Mossi, met with a California-based EV manufacturer in their Los Angeles office. Also in August 2021, CABEI scheduled meetings with Toyota, GM, and other companies to discuss business opportunities and identify hybrid vehicle models CABEI might be interested in purchasing.

50.     Following these meetings, however, Mossi used his position as Executive President to favor Cenntro, a start-up with a short track record and few vehicles on the road. Cenntro became a key focus of Mossi's attention despite the Bank's desire to establish relationships with larger and more established companies in the EV market. Mossi made this his focus while knowing it would better serve CABEI's interests to focus on growing CABEI's business position with a broader base of domestic EV companies, and more established EV companies at that.

51.     While serving as Executive President, Mossi began to spearhead initiatives to elevate Cenntro's brand and promote its business. Throughout Mossi's interactions with Cenntro, he communicated with Cenntro personnel based in the United States, including Marianne McInerney, who was based in D.C.

52.    For example, on November 21, 2022, at Mossi's urging, CABEI sponsored a conference in Washington D.C., the "CABEI Business Forum: Introducing Electric Mobility in Central America," in order to connect other U.S. electric vehicle companies, such as Tesla and General Motors, with Central American entrepreneurs. Cenntro was included in the conference among much more recognized companies. The forum featured U.S. Assistant Secretary of State Geoffrey Pyatt, Bureau of Energy Resources. Mossi opened the event. During his opening, Mossi stated that "CABEI has a mandate to lead these institutions and investors." Mossi announced plans to use Bank resources to finance millions in EV investments, stating "[w]e have close to $600 million in green bonds that we'd like to use to finance U.S. EV purchases, but we just can't find the vehicles." Throughout the conference, Mossi worked to encourage U.S. and regional stakeholders to further invest in the Central American EV industry, and Cenntro in particular.

53.    At the event, Marianne McInerney, then Chief Marketing Officer for Cenntro, remarked that she would "love Dr. Mossi to help facilitate a meeting with the [taxi] fleet managers if you have time in the future." In her remarks, McInerney made two things very clear: Cenntro planned to vigorously expand, and Mossi had personally committed to help Cenntro in these efforts.

54.    On November 29, 2022, Mossi emailed McInerney saying: "You don't know how happy I am about our meeting and your products. Could you please send me a proposal for a couple of your cars, so perhaps we can order them before the year closes? I would be interested in the plain delivery car, the one with the covered delivery cart, and the one that manages to distribute the cold chain for products like milk, poultry, or fish." Mossi did not explain, however, what business need CABEI had to purchase a refrigerated electric delivery car.

55.    On December 5, 2022, Martin Healy, a CABEI representative, followed up on Mossi's request, at Mossi's direction, to request a quote and stress that "time [was] of the essence" and that the request needed to be in by the end of the calendar year. The reason for the urgency is unclear.

56.    On December 29, 2022, Mossi again emailed McInerney and Billy Romero, Cenntro's General Manager, who is also based in the United States, proposing the following: "[P]erhaps we can certainly plan for a show of your capabilities in Honduras, where our footprint is larger. We do have the interest in buying more for pilot programs and would love to have you meet with local entrepreneurs some time." Again, Mossi did not explain what need CABEI had to purchase for itself a fleet of vehicles (electric or otherwise) or how such vehicles would advance CABEI's development mission. On information and belief, Mossi was pushing to use CABEI's resources to purchase electric vehicles for his own benefit, anticipating doing so would result in business opportunities for himself when he left CABEI and could golden-parachute into the electric vehicle sector with Cenntro.

57.    In January 2023, the collaboration between CABEI and Cenntro was featured in an article on a Washington, D.C. forum on electric vehicles in the region. McInerney was quoted in the article, again praising CABEI for investing in infrastructure for electric vehicles.

58.    Mossi's promotion of Cenntro and his close ties with McInerney and her team came to fruition just a few months later, in March, when Mossi used CABEI's discretionary funds to purchase Cenntro electric vehicles. In March 2023, Cenntro announced that they had delivered two electric vehicles to CABEI headquarters in Tegucigalpa, Honduras.[1] McInerney and Billy Rafael Romero, Cenntro's Regional Director, personally delivered the vehicles to CABEI. Mossi

---

[1]    LinkedIn Post by Cenntro Electric Group (CENN), March 2023.

posted about the delivery of the Cenntro vehicles to CABEI on his personal LinkedIn account. The post included a photo of him at the wheel of one of two new Cenntro vehicles purchased by Mossi using CABEI's discretionary funds. "The first two 100% electric vehicles," Mossi wrote. "Thanks Cenntro Electric Group (CENN) for inciting a new era of transport in the Centro America region!"[2] Mossi used Cenntro's NASDAQ symbol "CENN" in the post, demonstrating his full awareness of Cenntro's NASDAQ listing.



---

[2]  LinkedIn Post by Dante Mossi, March 2023.

[3]  LinkedIn Post by Dante Mossi, May 2023 (attaching picture of Mossi inside a Cenntro vehicle; "Already at our headquarters of the Central American Bank for Economic Integration - CABEI the first two 100% electric vehicles- thanks Cenntro Electric Group Ltd. (CENN) to incite a new era of transportation in the region of #CentralAmerica!") (translated from Spanish).

59.    Mossi paid for these electric vehicles with "discretionary" funds that he had personally approved for the Executive President to use. Specifically, by resolution PRE-82/2021 of September 2, 2021, Mossi approved a policy that provided CABEI's Executive President with discretionary funds allocated for the acquisition of goods or services that CABEI did not previously have. Even though vehicle purchases are not the type of purchases for which discretionary funds are commonly be used, Mossi used these funds to purchase two Cenntro Logistar LS100 vehicles for a total of $27,980 USD, bypassing the need to seek competitive bids or further approvals for the purchase. At no time did he explain why CABEI had reason to purchase these vehicles or any others.

60.    On March 14, 2023, as part of CABEI's efforts to advance its ESG initiatives, including by developing strong business relationships with key players in the EV space, CABEI and the U.S. Trade and Development Agency ("USTDA") executed a Memorandum of Understanding ("MoU") outlining a "non-exclusive framework of cooperation" to "facilitate collaboration between" the parties "to promote programs and projects." Section 2.4 of the MoU references an "Action Plan" that codified the parties' intent to collaborate on "matters of common interest," one of which was expanding electric mobility. At around this time, CABEI also began considering opening an office in the United States to facilitate this relationship. The Action Plan, however, never materialized. Nothing in the MoU ever materialized because CABEI's Executive President—Mossi—stopped pursuing it. Instead, Mossi began to pursue opportunities for himself, using his position at CABEI, and CABEI's resources, at the expense of the business opportunities CABEI's collaboration with the USTDA would have afforded it.

61.    While Mossi purported to be developing the relationship with Cenntro for the Bank's benefit, as would become clear in the ensuing months, Mossi was setting up a lucrative

exit opportunity for himself using the Bank's resources and promises of the Bank's financing of deals involving Cenntro, transparently working not to advance CABEI's business interests but rather to set himself up for a kickback from Cenntro when he left CABEI.

62.     In his single-minded pursuit of Cenntro, Mossi necessarily let languish CABEI's opportunities to further develop its business with more established EV companies, thereby doing harm to CABEI's business interests in the domestic EV market. CABEI had been positioning itself and spending significant resources to develop relationships with U.S. automakers such as Tesla and several Detroit-based automakers, and CABEI expected Mossi to be furthering its business interests in the U.S. market. But Mossi's prioritization of his self-serving relationship with Cenntro—a start-up with no track record and one that did not align with CABEI's strategic environmental, social, and governance ("ESG") goals—did not further CABEI's interests in the United States but instead squandered CABEI's opportunities with these bigger companies and snuffed out CABEI's existing business relationships with said companies, which thus harmed CABEI's position within the domestic EV market. During Mossi's tenure CABEI also facilitated meetings between taxi companies and U.S. EV manufacturers, a corporate opportunity Mossi has since stolen. The results speak for themselves: Mossi squandered the MoU with the USTDA, formed no meaningful relationships with any domestic EV company except Cenntro, and the only one to benefit from the relationship with Cenntro went to Mossi himself, not the Bank.

**E.    CABEI's Board of Governors Votes Not to Renew Mossi's Term in May 2023, While Mossi Continues His Promotion of Cenntro**

63.     On May 12, 2023, CABEI's Board of Governors unanimously decided to seek to open the contest for a new Executive President, rather than to confirm Mossi for a second five-year term. Accordingly, Mossi's term as Executive President was set to expire on November 30, 2023.

64.     After the decision to not renew his term was made, Mossi continued to use his perch at the Bank to further his relationship with Cenntro and broker future business deals to build a lucrative exit ramp for himself. Even after he was informed his term would not be renewed, Mossi continued using bank resources to advance Cenntro's interests.

65.     On May 17, 2023, he emailed Scott Hansen, the Economic Counselor at the U.S. Embassy in Tegucigalpa, saying: "Now that the storm of the re-election has passed, I hope, we need to move on with the other projects. I wanted to ask you whether the potential date of June 13h [sic], might work for the US Embassy. We are planning to bring an executive from CENNTRO (the cars) and from Blink (the chargers), and if we make it, a couple of e-bikes. I was told that we should like with Rossana Lobo, yet, I wanted to run the date with you, to see if this works, potentially to have you or Madam Ambassador for short media event on how the US provides sustainable technology . . . . I want this to be a legacy from our innovation centers here at CABEI."

66.     Mossi also became more persistent in his communications with Cenntro. On July 6, 2023, he emailed Romero: "I wanted to follow up whether there is any progress in your conversations with potential new clients? Just to let you know that I chatted with a company called Diunsa[4] that might be interested in electric mobility, particularly low cost. Let me know if interested to get you in touch." Even as his term as Executive President was coming to a close, he continued to offer to use CABEI resources to help Cenntro: "let us know if there is something from our end to assist you."

67.     On July 10, 2023, Romero emailed Mossi with several updates on Cenntro's business strategy in the region and business prospects. "Currently, we are in conversation related to performance and prices with several big local firms considering sustainable mobility in their

---

4     Dinusa is Hondura's largest department store and sells cars, among other items.

fleet. To be more specific, LACTHOSA, has shown that they are seriously considering entering electric mobility, and we hope to get some orders and create a positive impact in their organization as the relationship advance [sic]." Romero promised to update Mossi on their progress and then pivoted to how Diunsa "fits the profile of last-mile delivery, which is our main strength" and then asks that Mossi "provide [Cenntro] with some contacts in this company[.]"

68.    Mossi replied the same day and confirmed that he had shared Cenntro's information with contacts at Diunsa. He also proceeded to give some background on Diunsa as "part of the Grupo FICOHSA, one the two largest banks in Honduras . . . and they do have our own credit lines. I will let you know what they said."

69.    Shortly thereafter, on August 15 and 16, 2023, Mossi and Elan Tabora, CABEI's Senior Country Executive for Honduras and Belize, exchanged emails discussing the Palomera International Airport Taxi Cooperative. Mr. Tabora pointed out that the eight vehicles the taxi cooperative needed could not be acquired through the cooperative itself because they were not organized in a manner to support the requisite financing. As a result, each taxi driver had to find the vehicle and the financing based on his personal financial capabilities. Mossi responded by pitching Cenntro cars for the Palomera International Airport Taxi Drivers Cooperative, noting that "a $15,000 cab is below the price of a traditional equivalent . . . let's ask CENNTRO for options?"

70.    On September 29, 2023, Mossi emailed Romero to update him on a meeting he held "at CABEI with the participation of representatives of two taxi cooperatives, one operating at the Palmerola airport in Comayagua and the other at the Toncontín airport in Tegucigalpa." According to his email, both taxi cooperatives serve passengers traveling to and from both airports throughout the country. When both cooperatives expressed an interest in purchasing a fleet of vehicles, Mossi recommended "vehicles that [Cenntro] offers" and asked that Romero accompany him to an in-

person meeting with the representatives of both taxi cooperatives, as well as the advisor of the concessionaire of Palmerola International Airport and "representatives of CABEI and Banco FICOHSA," the commercial bank through which CABEI would be channeling the funds to finance the purchase of the vehicles. The meeting was scheduled for October 2, 2023.

71.    Just months before the end of his term, on October 4, 2023, Mossi yet again offered CABEI funds to help Cenntro. In an email to Romero, McInerney, and another Cenntro employee based in New York, Mossi shared, "I am delighted we are moving forward with this first transaction for 50 taxis, yet, the potential is a market of 50,000 taxis in Honduras only. Let us know how the transaction advances, since we are fully behind the financing."

72.    On information and belief, from May 2023 until the end of 2023, Mossi held meetings with taxi cooperative leaders to discuss Cenntro's EVs and to negotiate a financial package to enable the taxi cooperative members to purchase Cenntro vehicles. According to one taxi cooperative leader, the cooperative was offered a financial package that priced the electric vehicles between USD $23,000 and $26,000, which CABEI would subsidize to reduce the sales price by approximately USD $5,000, resulting in a purchase price between USD $18,000 and $21,000. That amount would be financed through a loan from Banco Fichosa.

73.    On information and belief and as is further discussed below, since leaving CABEI, Mossi has imported four Cenntro vehicles to Honduras and continues to be actively involved in the promotion and sale of Cenntro's products, working as a consultant for the company he created for that purpose, SOLMECA. While Mossi's main focus has been on Cenntro, he was also negotiating deals with the U.S.-based EV charging station company, Blink, while still employed by CABEI.

**F.    As the Bank Searches for His Replacement, Mossi Commences Smear Campaign Against CABEI and Board of Governors, While Still Serving as Executive President**

74.    As soon as the Board of Governors announced its decision to elect a new Executive President, Mossi began making false statements internally at CABEI and publicly about the Board of Governors, the Board of Directors, and their actions. At the same time, the Board of Directors opened a process to elect and appoint a new Executive President, hiring the same outside consulting firm that it had used during its prior search for an Executive President, which had included Mossi among the potential candidates.

75.    Mossi first began his smear campaign internally. On May 15, 2023, just four days after the decision to start the search for a new Executive President, Mossi called an all-employees meeting in Tegucigalpa. At this meeting, Mossi falsely accused the Board of Governors of not being transparent in its election process even though he knew the search was being conducted by an external consulting firm, and in the same manner that had been used to select him years before.

76.    Days later, on May 17, 2023, in an attempt to stop Mossi from abusing his last few months as Executive President to harm the Bank's interest, the Board of Governors transferred the power to act as the Bank's official spokesperson to the Executive Vice President by passing Resolution DI-55/2023.

77.    On information and belief, in or around September of 2023, Mossi also attempted to visit credit rating agencies in New York, including Moody's, for the purpose of negatively influencing their decisions affecting CABEI. When it caught wind of this, the Board of Directors acted to prevent Mossi from undertaking further such communications so that he could not abuse his position to harm the Bank. Specifically, by resolution ACDI-47/2023 approved on July 29, 2023, it was established that, during the transition period in the position of Executive President, "communications with the risk rating agencies, including requests for information formulated by

them, as well as the issuance of opinions and recommendations that may have an impact on the Bank's risk rating, shall continue to be the responsibility of the Finance Management." The Board of Directors extended this accord to all "relations with sources of funds and any other counterparty related to the financial management of the Institution."

78.    Yet on October 26, 2023, Mossi gave an interview on Canal 5 "El Líder," Honduras's leading television channel. During this interview, Mossi again commented on the purported lack of democracy and transparency in the election process for a new Executive Director at CABEI, reiterating the same comments that he had made internally at the all-employees meeting. More specifically, Mossi stated that journalists had asked for his opinion on the ongoing election, noting that "they see something that is not correct."[5] Seconds later, Mossi stated that "I was surprised by the selection process for the president of a development bank that is vital for the region. CABEI provides half of resources for the development of Central America. We have relationships with bondholders in the whole world—we are global. I think we deserve something better than [this] process…it must be a serious process of looking for the best person for this new position."[6]

79.    During this same time, Mossi started using social media to spread his false message about CABEI's purported lack of "transparency." On November 13, 2023, Mossi quoted an X post saying that "analysis finds @CABEI_Org's attempts at #transparency under @DanteMossi lacking" and responded saying that "there are changes that are limiting severely what we communicate. More information about our operations and decisions are needed for an institution as relevant as @CABEI_org !"[7]

---

[5]    "Frente a Frente – 26 de octubre 2023," 24:30-25:15 (CABEI translation).

[6]    "Frente a Frente – 26 de octubre 2023," 30:05-30:30 (CABEI translation).

[7]    X Post by Dante Mossi (@DanteMossi), November 13, 2023.

80.    As a result of this conduct which was contrary to the interests of CABEI, the Board of Directors voted on or about October 8, 2023 to transfer some of Mossi's responsibilities as Executive President to the then-Executive Vice President, Jaime Roberto Díaz Palacios, even though Mossi's term had not yet officially ended.

81.    Also while still at the Bank, Mossi hired a lawyer to assess the Board of Directors' decision not to renew his term as Executive President. Mossi hired the lawyer for his own benefit and to challenge the decision, even though the non-renewal was standard practice and in line with the Bank's Constitutive Agreement and procedures. But he paid the lawyer $6,000 in fees using CABEI funds. That personal expense had never been approved by the Bank. Due to the lack of approval and the personal nature of the expenditure, CABEI subsequently withheld the $6,000 from Mossi's severance to cover the misallocated funds. Mossi then began claiming that CABEI "wrongfully" withheld the $6,000 and threatened to sue CABEI.

82.    Meanwhile, the Board of Directors continued with an orderly process to elect a new Executive President. By Resolution DI-123/2023 of October 25, 2023, the Board of Directors proposed to the Assembly of Governors the list of three candidates to fill the position of Executive President. On November 17, 2023, the Board of Governors adopted Resolution No. AG-17/2023, whereby Ana Guissella Sánchez Maroto was elected Executive President of CABEI, for a period starting December 1, 2023 until November 30, 2028.

**G.    Mossi Continues Public Smear Campaign to Harm And Extract Money from CABEI After His Term Expires on November 30, 2023**

83.    Upon leaving the Bank, Mossi immediately continued to publicly smear CABEI, undermine its leadership, and harm its ability to carry out its core business, in violation of his fiduciary duties and CABEI's policies. Mossi's prior position as CABEI's Executive President gave his statements credibility they otherwise would not have. Using social media platforms such

as X and LinkedIn, as well as other outlets, Mossi has publicly disclosed sensitive, confidential, and misleading information about CABEI. He has repeatedly and falsely attacked the Bank, falsely claiming it lacks transparency, and that its ability to do business and make good on its loans is in question. He further made false and unsubstantiated allegations of corruption within the institution.

84.    The public's perception of the transparency of a financial institution is essential to its business and operation. When a bank is perceived by the public to be transparent and accountable, the bank can more effectively and efficiently conduct its business. On the other hand, when a bank is perceived to lack transparency and accountability, it must spend resources to improve public trust, thereby reducing what it can devote to other purposes. It follows that any attacks on a bank's transparency lead to real financial harm.

85.    Mossi's untrue—and extortionate—statements are recounted below. Despite their falsity, Mossi's attacks have caused CABEI monetary harm, including but not limited to having to perform additional diligence to address concerns arising out of his false statements.

86.    For example, on December 9, 2023, Mossi posted to X that "[i]t is very important to improve the transparency mechanisms in the @BCIE_Org that began in my administration and that were restricted since April 2023."[8] With posts such as this one, Mossi both divulged confidential information about Bank operations and implied that, as former Executive President with inside information, he believed the Bank lacked transparency mechanisms and that these mechanisms worsened starting in April 2023, around the time the Board of Directors declined to renew his term as Executive President.

87.    On December 11, 2023, Mossi called for CABEI's Director to comment on the "difficulty for the press to know how the $1 million donation to the government of #CostaRica

---

[8]    X Post by Dante Mossi (@DanteMossi), December 9, 2023. @BCIE_Org is CABEI's official X account.

was used today? And not only the authorization, but the execution of those funds."[9] Mossi once

again put CABEI's transparency into question as well as impugning CABEI's business, implying

that CABEI was giving away ("donating") money and that it was incompetent in its core business

functions of providing and tracking financing.

88.    Two days later, on December 13, 2023, Mossi posted on X about a $700 million

infrastructure loan CABEI had approved for Costa Rica, stating that "if there are doubts and

recommendations for improvement - the credit should be returned for reconsideration by the

government."[10] This time, Mossi publicly suggested that CABEI had funded a project without

conducting its due diligence.

89.    On December 15, 2023, Mossi posted on X: "Fighting corruption, even in the

boardroom, is important. During my time at this integration bank, it is sad to see some extra-

regional member who receive a bonus for residing in Tegucigalpa and spend it in their country of

origin."[11] Once again, Mossi was publicly smearing CABEI and implying he had inside

information to support his smears.

90.    Mossi also began exposing confidential personnel decisions of CABEI, criticizing

CABEI over staff restructuring and cuts. For example, on December 14, 2023, Mossi posted on X

urging CABEI to "address the labor liabilities of thirteen staff and contractors with a capable

person."[12] That same day, on LinkedIn, Mossi addressed the dismissal of the thirteen employees,

claiming that "it is incredible that these people do not have access to the human resources offices

to formally hand over the assets under charge, liquidation, much less when they will be paid their

---

[9]    X Post by Dante Mossi (@DanteMossi), December 11, 2023.

[10]    X Post by Dante Mossi (@DanteMossi), December 13, 2023.

[11]    X Post by Dante Mossi (@DanteMossi), December 15, 2023.

[12]    X Post by Dante Mossi (@DanteMossi), December 14, 2023.

labor liabilities."[13] Similarly, on December 15, 2023, Mossi reposted another post asking the Bank to disclose more information, specifically saying, "It would be good of you could also expose the people who lost their jobs and the people who are still waiting for their contracts to be signed to start working."[14] Mossi added, "Good question for the @BCIE_Org – the HR manager is not the most capable person…"[15] With these posts, Mossi was baselessly implying that CABEI had poor management and implying something nefarious in the fact that CABEI was not publishing information about confidential employment decisions.

91.    Mossi went a step further by suggesting that CABEI was unable or unwilling to pay its employees. On December 20, 2023, Mossi posted that "the most severe reputational risk of a bank is not paying. Let alone its employees who have been laid off. It's not about talking bad or good, it's about building. No serious institution can boast of disrespecting labor rights. Our CABEI needs a greater social audit, and an end to these setbacks."[16] Here, Mossi simultaneously defamed CABEI and acknowledged the potential reputational harm of his statements.

92.    That same day, December 20, 2023, Mossi had an interview with the Honduran newspaper, *El Heraldo*, during which he made a series of allegations against CABEI. He notably stated during that interview that he was aware that he had a binding "confidentiality agreement not to share CABEI documents."

93.    Mossi has continued to question CABEI's transparency in the new year, saying, it is "[i]nteresting that today the President of @CABEI_Org talks about transparency and data, and unfortunately, she has neither one nor the other. I beg you to update the data on the website with

---

[13]    LinkedIn Post by Dante Mossi (@DanteMossi), December 14, 2023.

[14]    X Post by Dante Mossi (@DanteMossi), December 15, 2023.

[15]    X Post by Dante Mossi (@DanteMossi), December 15, 2023.

[16]    X Post by Dante Mossi (@DanteMossi), December 20, 2023.

the names of the new Directors, for example, in particular of #Guatemala to support the effort at the level of Directors. Because that of #CostaRica is not prone to it."[17] With this post, Mossi accused CABEI of lacking transparency and adherence to facts.

**H.    Mossi Directly Contacts Competitors of CABEI to Disparage the Bank**

94.    During this same time period, on information and belief, Mossi started reaching out to CABEI's competitors, disclosing that he did not know where the Bank would go without his leadership and insinuating that CABEI's future was poor and uncertain. On December 13, 2023, Mossi reached out to one of CABEI's business partners at a major New York investment bank, saying that the first thing CABEI's new President did upon assuming her role "was to fire the CFO and the Head of Environmental and Social Safeguards, without proper replacements, that surely, will take at least three months to replace." He continued saying "she also disbanded the non-sovereign window, so, I am not sure what her strategy is."

95.    It is unknown to how many of CABEI's business partners Mossi made similar statements. These false insinuations caused the Bank to have to expend time and resources to conduct additional diligence calls on its upcoming bond offering, of which Mossi was fully aware, increasing CABEI's cost to do business.

**I.    Mossi Continues to Harm CABEI's Reputation and Disclose Confidential Information after Bond Offering.**

96.    Mossi's attacks on CABEI intensified in the new year, as he focused on CABEI's bond offering as a way to cause harm to CABEI.

97.    On January 17, 2024, one day before CABEI was set to launch its annual bond offering, in which Mossi had been involved as Executive President, Mossi took to social media and posted, in reference to the $6,000 CABEI deducted from his severance to cover the legal fees

---

[17]    X Post by Dante Mossi (@DanteMossi), March 6, 2024.

he incurred in his personal capacity: "[I]f CABEI acts in this unilateral and arbitrary manner without due process, with whoever was its highest authority and legal representative, how do you think that a foreign investor would be interested in buying bonds from an institution that does not pay its obligation in a timely manner."

98.    On February 24, 2024, Mossi posted on X that "@BCIE_Org funds belong to #CentralAmerica and hopefully their governance will be more transparent."[18] Mossi continued to criticize the Bank for purportedly "hiding" information the public was purportedly entitled to know, though he could make no concrete claims about what he believed that information to be.

99.    In early March, Mossi posted on LinkedIn that CABEI's "governance has fallen into a trap caused by the mismanagement of public funds granted to the Presidency of #CostaRica. In addition to the responsibilities of those government officials who lent themselves to collusion, an issue that is a matter for the supervisory authorities of that country, there is the issue of those at CABEI who lent themselves to this non-competitive practice."[19] With this, Mossi made specific, false assertions against CABEI with respect to a deal he himself had worked on, an infrastructure loan to Costa Rica, and began a series of attempts to spur investigations of CABEI by Costa Rican authorities on false pretenses. He also continued to question the Bank's transparency without basis, stating that "since December of last year, it said it would be the administration of transparency and governance, although there has been no progress, but regression."[20]

100.    On March 12, 2024, Mossi posted on X: "I hope that at today's @BCIE_Org Board of Directors meeting they focus on the strategic work of the bank, tend to the lines of work, and address real problems such as the investigation of the use of the $1 million by @RodrigoChavesR's

---

[19]    LinkedIn Post by Dante Mossi [2 months ago].

[20]    LinkedIn Post by Dante Mossi [2 months ago].

administration and other irregularities of the CABEI office in San Jose that have not been forgotten."[21] Rodrigo Chaves is the President of Costa Rica. Mossi once again makes vague and unspecified allegations of "irregularities" at CABEI, and does so with respect to a loan he worked on, insinuating special knowledge of such "irregularities." Shortly thereafter, March 21, 2024, Mossi referenced the same loan, stating that "[i]t seems like something smells bad [fishy]..."[22]

101.    Mossi continued, without support or basis, to question the transparency of the Bank. On March 23, 2024, Mossi posted on X that "since I left the public information on interest rates has not been updated. Please update! Transparency occurs in actions and not speeches."[23] One day later, on March 24, 2024, Mossi posted on X that "@BCIE_Org is a bank for all of us who pay taxes and it should matter to all of us. There are confidential topics, but there are also public topics, such as board approvals and interest rates."[24] Later, on April 9, 2024, he added, "I would like to challenge @BCIE_Org to publish its data and approvals [of proposals]."[25]

102.    On April 3, 2024, Mossi again posted on LinkedIn about the withheld severance. This time, he falsely claimed to have sued CABEI, and positioned his claim over $6,000 in withheld severance as a referendum on CABEI's leadership: "Many people ask why I am suing for a compensation of only $6,000, and frankly, it is not the amount that bothers me, but the absolute ignorance of the corporate governance of the Central American Bank for Economic Integration - CABEI, and not understanding that the Executive President is not a subordinate of his Board of Directors or of the current Executive President, but rather of his Assembly of

---

[21]    X Post by Dante Mossi (@DanteMossi), March 12, 2024.

[22]    X Post by Dante Mossi (@DanteMossi), March 21, 2024.

[23]    X Post by Dante Mossi (@DanteMossi), March 23, 2024.

[24]    X Post by Dante Mossi (@DanteMossi), March 24, 2024.

[25]    X Post by Dante Mossi (@DanteMossi), April 4, 2024.

Governors. I trust that the result of the trial, in the ruling that the Central American Court of Justice could give, would reiterate respect for due process, and the seriousness of the institutions around the Central American Integration System. The value in question was fees paid to a distinguished jurist for giving an opinion, which was contrary to what was decided, and illegal, by the Board of Directors, in what was called, 'a peaceful transition' to a new Presidency."[26] Mossi leaked a copy of his purported complaint to the media in an undisguised attempt to extort a settlement from CABEI.

103.    Mossi continued to seed bogus information and insinuations about CABEI's relationship with Costa Rica. On May 5, 2024, Mossi posted on X saying that "much of [the public infrastructure projects] are financed by the @BCIE_Org but, unfortunately, the inability to execute has limited water projects, roads, hospitals, and City Government. Maybe in this week's Assembly they will talk about how to support the management of those projects!"[27] Then, on May 6, 2024, Mossi posted on X: "It will be interesting to hear the names of those involved in @BCIE_Org, which I suspect are the same ones that Ana Sanchez ignored! Very timely for the Board of Governors!"[28] The next day, he posted on X insinuating insider knowledge about CABEI and Costa Rica: "Interesting development related to the case [between] @BCIE_Org and #CostaRica – the Bank's controlling bodies had told me that they had concluded and now they have not – this extends very high [up the management ladder]. I hope the Governors see this crisis."[29] That same day, he added: "The silence of the President [of] @BCIE_Org on an issue that is normally remitted by the Ministry of Finance of #Costa Rica and received by the Country Head of @BCIE_Org in

---

[26]    LinkedIn Post by Dante Mossi, January 17, 2024.

[27]    X Post by Dante Mossi (@DanteMossi), May 5, 2024.

[28]    X Post by Dante Mossi (@DanteMossi), May 6, 2024.

[29]    X Post by Dante Mossi (@DanteMossi), May 7, 2024.

San Jose."[30] With these posts, Mossi continued to insinuate there was some "crisis" related to CABEI's loan to Costa Rica involving CABEI's management.

104.    On May 8, 2024, Mossi commented once more on the withheld severance with his familiar themes of a purported lack of transparency and CABEI's purported inability to pay its debts, stating, "I hope the Administration of the @BCIE_Org understands that there are rules and the opacity of withholding a payment does not correspond to an AA rated bank – for now."[31]

105.    That same day, Mossi began threatening to sue CABEI for over $2.5 million. Mossi sent CABEI a complaint alleging that CABEI had not only wrongfully withheld the $6,000, but that CABEI had somehow damaged Mossi's reputation, claiming an unsupported $2,375,810 in reputational and moral damages.

106.    A week later, Mossi suggested his criticisms of CABEI over layoffs should affects its credit rating, posting, on May 15, 2024, that "[t]he new agenda of the @BCIE_Org seems mired in more layoffs, and specialized personnel in key areas. Congratulations to the people who lost their jobs today, Successes with risk rating agencies."[32] That same day, Mossi posted, "[t]he @BCIE_Org austerity *(sic)* is very selective and many valuable employees were laid off. The bank's rating is at risk – the most valuable thing about the Bank is its people."[33] Mossi again claimed insider knowledge regarding purportedly bad conditions at CABEI: "I estimate that things will get complicated for @BCIE_Org when the details of the five-year setback she is carrying out are known."[34]

---

[30]    X Post by Dante Mossi (@DanteMossi), May 7, 2024.

[31]    X Post by Dante Mossi (@DanteMossi), May 8, 2024.

[32]    X Post by Dante Mossi (@DanteMossi), May 15, 2024.

[33]    X Post by Dante Mossi (@DanteMossi), May 15, 2024.

[34]    X Post by Dante Mossi (@DanteMossi), May 15, 2024.

107.    Mossi continued to make baseless attacks on CABEI's management, posting, on May 15, 2024, a Honduran newspaper article about changes approved by CABEI's Governors, commenting that they were akin to "[g]oing back to the dark past of @BCIE_Org and [they] limit and make financing to the region more expensive."[35]  In that same tweet, he tagged two institutions—the KfW Development Bank and the French Development Agency—inviting them to comment on these changes.[36]

108.    Mossi then instigated an investigation of CABEI by Costa Rican authorities. On May 20, 2024, he appeared to testify before a commission of the Costa Rican Congress about purportedly irregular loans requested by the government of Costa Rica in 2023. In his testimony, Mossi blamed former colleagues at CABEI for purportedly mishandling requests from Costa Rica, but was unable to back up his accusations with anything specific.

109.    The same day he testified before the Costa Rican Congress, on May 20, 2024, Mossi posted on X about the information he intended to share. "[I]t is a privilege to have worked at @BCIE_Org and I know the obligations [from when] I was its Executive President. Today I am a citizen in full use of my rights as a citizen, and do not worry, I have no confidential documents to share this afternoon. I hope you can see it. A hug and take care that your tica (Costa Rican) friend does not kick you out, it is not over yet."[37]

110.    Mossi continued to use social media to disparage CABEI's management decisions and insinuate corruption in its relationship with Costa Rica. On May 25, 2024, Mossi commented that "[i]n the new administration of @BCIE_Org they removed many Hondurans and women journalists and directly hired a communications company from #CostaRica that incidentally works

---

[35]    X Post by Dante Mossi (@DanteMossi), May 15, 2024.

[36]    *See* X Post by Dante Mossi (@DanteMossi), May 15, 2024.

[37]    *See* X Post by Dante Mossi (@DanteMossi), May 20, 2024.

very poorly."[38] That same day, he again tweeted that "Belinda de Martínez confirms layoffs of Hondurans in @BCIE_Org."[39]

111.    During the next couple of weeks, Mossi continued to accuse CABEI of lacking transparency, even attempting to suggest that Costa Rica should pass laws to "compel greater transparency," on May 26, 2024, when he posted on X: "The @asambleacrc can legislate to compel greater transparency of the @BCIE_Org in the area of loans and grants - through instructions to the @HaciendaCR - the same rule as the @WorldBank!"[40] The next day he added: "For a @BCIE_Org administration that indicated an improvement in governance and transparency, it has not published data on disbursements, loans, or grants... attention Governors."[41] On June 4, 2024, he posted saying, "This second donation from @BCIE_Org was never announced to the public - @asambleacrc congratulate them for their audit work & media for collaborating. Zero transparency friends of #Centroamerica!"[42] In a later X post that day he elaborated: "I imagine that @BCIE_Org as respectful of its regulations (at http://bcie.org) will proceed to demand that the Government of @RodrigoChavesR return the funds granted in the first donation. I requested the investigation in August 2023, late justice is not justice."[43]

112.    In mid-June, it became clear that Mossi's extensive campaign of disparagement and bogus lawsuits and investigations was an effort to line his own pocket. For example, on June 8, 2024, a political scientist called Mossi out on X, saying "#Nicaragua: After suing @CABEI_Org for $2 million, @DanteMossi is now featured on #Ortega-#Murillo regime state TV as

---

[38]    X Post by Dante Mossi (@DanteMossi), May 25, 2024.

[39]    X Post by Dante Mossi (@DanteMossi), May 25, 2024.

[40]    X Post by Dante Mossi (@DanteMossi), May 26, 2024.

[41]    X Post by Dante Mossi (@DanteMossi), May 27, 2024.

[42]    X Post by Dante Mossi (@DanteMossi), June 4, 2024.

[43]    X Post by Dante Mossi (@DanteMossi), June 4, 2024.

commentator. While we once suspected him to be on the take as Exec President, he may now literally be on the take. #SOSNicaragua."[44] Mossi responded, "It would be much better to have a conversation about @CABEI_Org with you and have the facts right. I have moved on to other challenges! I am a citizen of #CentralAmerica with every right to comment on our economic affairs as I please."[45]



---

[44]    X Post by Ryan Berg, PhD (@RyanBergPhD), June 8, 2024.

[45]    X Post by Dante Mossi (@DanteMossi), June 8, 2024.

113.    During the rest of June 2024, Mossi continued making statements about lowering CABEI's rating,[46] attacking CABEI's lack of transparency,[47] and criticizing CABEI's business decisions.[48]

114.    In August 2024, Mossi continued to publicly disclose sensitive, proprietary, and confidential information about CABEI. Notably, on August 23, 2024, Mossi posted a picture of a table showing CABEI'S purported disbursements to each of its member countries, adding, "Given the lack of transparency of @BCIE_Org in publishing data, I was anonymously sent this report of disbursements in 2024: #Panama and #Nicaragua at the forefront - #Colombia is budget support. #CostaRica and #RepublicaDominicana far behind - @anticorruption @nacion @diarioelheraldo @proselitistahn @OCCRP @washingtonpost."[49] He proceeded to post the disbursements picture twice more within the next two days. On August 25, 2024, he again posted confidential information about the disbursements, this time using a screen capture of a table showing how much of the total disbursement to each member country was an investment and how much could be categorized as a "quick disbursement."[50]

---

[46]    X Post by Dante Mossi (@DanteMossi), June 12, 2024 ("This type of statement reflects a probable lowering in @BCIE_Org's credit rating.").

[47]    X Post by Dante Mossi (@DanteMossi), June 12, 2024 ("Incredible is the speed of action on the issue by the @BCIE_Org and the officials, such as a Director and a country head of the Bank who knew about the issue [of Bulgarelli's alleged fraud] and never thought of reporting it? Poor transparency and governance.")

[48]    X Post by Dante Mossi (@DanteMossi), June 13, 2024 ("It is demonstrated that under the current management of @BCIE_Org it will not be possible to capitalize our bank. Perhaps in that CAF model, where there are no directors who earn large salaries, it served as inspiration for the changes that must be made at CABEI.")

[49]    X Post by Dante Mossi (@DanteMossi), August 23, 2024.

[50]    X Post by Dante Mossi (@DanteMossi), August 25, 2024.



## J.     Mossi Goes Into Business With Cenntro

115.     In the meantime, Mossi was taking advantage of the groundwork he had laid while still at the Bank, using Bank resources to set himself up to go into business with Cenntro.

116.     In February 2024, Mossi formally established a company, SOLMECA, to continue the work that he already started by handling the distribution and servicing of Cenntro electric vehicles in Honduras. Mossi began acting as Cenntro's exclusive representative and distributor in Honduras as early as March 2024. On information and belief, Mossi's first client will be the taxi cooperative operating the Tegucigalpa-Palmerola route in Honduras—the deal he used Bank resources to set up.

117.    On information and belief, Mossi plans to expand his distribution of Cenntro vehicles to other countries and plans to profit financially from that expansion.

118.    Mossi has been vocal about this commitment to Cenntro and his new distribution company, SOLMECA, in the press and on social media.[51]

119.    In late April 2024, Mossi posted to his personal LinkedIn account that the first shipment of Cenntro vehicles was set to arrive in a few days.[52] Also on the way, according to Mossi, were two electric vehicle charging stations, provided by U.S. based-company, Blink. In the same post, Mossi reiterated that he had created a company to handle the commercialization of the vehicles and that he saw his potential market as the 100,000 taxis in Honduras' two largest cities.

120.    Under Mossi's direction, the first shipment of four Cenntro-made Avantier model passenger electric vehicles were scheduled to arrive in Honduras in late May 2024.[53] Avantier Motors is a subsidiary of Cenntro and is also headquartered in Freehold, New Jersey. These Avantier vehicles will reportedly be used in taxi fleets and for other commercial applications.

**FIRST CAUSE OF ACTION**
**Violations of RICO, 18 U.S.C. § 1962(c)**

121.    CABEI repeats and incorporates the allegations above as if set forth herein.

122.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., provides a civil cause of action for "any person injured in his business or property by reason of a violation of" the RICO statute. CABEI is a person within the meaning of 18 U.S.C. § 1962(c).

*The RICO Enterprise*

---

[51]    To the press, Mossi has expressed that his commitment to electric mobility benefits the environment and "wallet[s]." *See La Prensa* (Honduras), March 2024.

[52]    LinkedIn Post by Dante Mossi, April 2024.

[53]    LinkedIn Post by Dante Mossi, April 2024.

123.    The RICO enterprise is comprised of Mossi and his Mossi's EV importing company, SOLMECA, which have been working hand and glove with Cenntro. While still at the Bank, Mossi used CABEI's good will, resources, reputation, and relationships to broker deals benefiting himself and Cenntro, and following his departure from the Bank, Mossi organized SOLMECA and has worked together with SOLMECA on an ongoing basis since its creation to steal corporate opportunities from CABEI. Mossi continues to direct and participate in the operation and management of the enterprise.

124.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c) because Mossi's predicate acts of extortion, mail, and wire fraud have been directed at enriching Mossi and furthering business opportunities between Mossi, SOLMECA, and Cenntro, while simultaneously undermining CABEI's domestic and international business relationships. In fact, Mossi organized SOLMECA to consummate Mossi's scheme to derive wrongful profits from his association with Cenntro and take business deals he supposedly set up for CABEI's benefit while at CABEI, but that he really set up to profit himself once he left the Bank. In addition to using CABEI's resources and goodwill to foster relationships and broker deals he is now taking advantage of with SOLMECA, Mossi defrauded CABEI into purchasing multiple electric vehicles and chargers to benefit Cenntro so that Cenntro would continue to give him opportunities after the left the Bank. SOLMECA and Mossi separately maintain social media accounts that cross promote SOLMECA's business on U.S. platforms, and SOLMECA maintains a website accessible from the U.S.

*Pattern of Racketeering Activity*

125.    Mossi conducted and managed the operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

*Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951*

126.    At all times relevant to this Complaint, Mossi was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

127.    Mossi has engaged in a pattern of racketeering in the operation of this enterprise. For example, Mossi has engaged in attempted extortion through the wrongful use of economic fear to obtain money or property to which he is not entitled, specifically, a lucrative settlement from CABEI to buy his silence and cessation of attempts to interfere with its business relationships.

128.    To induce economic fear in CABEI, Mossi has engaged in a pattern of making false statements about CABEI to the public and to CABEI's business partners, designed to damage CABEI's standing and ability to conduct business and carry out its mission, and to increase its costs of doing so. For example, on December 13, 2023 and in an attempt to damage CABEI's relationship with a major institutional business partner based in New York, Mossi reached out to one of its representatives and falsely criticized the leadership's business decisions as a part of his attempt to increase CABEI's cost to do business and to exert pressure on CABEI in order to extract a payment.

129.    In the course of this campaign, Mossi has violated his confidentiality obligations to CABEI and interfered with CABEI's business relationships with the intent of causing CABEI's business partners to cease doing business with CABEI. Mossi has also attempted to induce economic fear in CABEI by continually threatening to file—and eventually filing in early July

2024—a sham legal proceeding against CABEI before the CCJ, as well as attempting to seed bogus investigations of CABEI in Costa Rica and elsewhere even though he knows CABEI has engaged in no wrongdoing.

130.    Mossi has also repeatedly claimed that CABEI wrongfully withheld $6,000 from his severance, deliberately implying that CABEI does not satisfy its financial obligations, when in fact it was Mossi who acted wrongfully in using Bank funds to reimburse a personal expense.

131.    On April 3, 2024, Mossi posted on LinkedIn about the withheld severance, this time lying about having filed a claim against CABEI, which he did not in fact do until later, again in an effort to sway public opinion about the bank and to extract a payout from CABEI.

132.    As detailed throughout this Complaint, Mossi also repeatedly made vague and disparaging statements falsely implying knowledge of nefarious activities at the Bank, implying that the Bank should not be trusted by the investing public. For example, on December 20, 2023, Mossi posted on X: "the most severe reputational risk of a bank is not paying. Let alone its employees who have been laid off. It's not about talking bad or good, it's about building. No serious institution can boast of disrespecting labor rights. Our CABEI needs a greater social audit, and an end to these setbacks."

133.    He also violated his confidentiality agreement in an attempt to extort CABEI. As noted, the day before CABEI was set to launch the bond offering, Mossi wrote on LinkedIn, once again referencing the $6,000 he claimed CABEI improperly withheld from his severance after he used Bank funds to pay personal legal fees: "[I]f CABEI acts in this unilateral and arbitrary manner without due process, with whoever was its highest authority and legal representative, how do you think that a foreign investor would be interested in buying bonds from an institution that does not pay its obligation in a timely manner?" Mossi made this post while he was in the United States

and directed the statements at U.S. investors when CABEI was actively marketing its bonds, implying CABEI could not pay its debts.

134.    Finally, Mossi is currently urging various member countries, and especially Costa Rica, to launch investigations into CABEI to impose further pressure on the Bank. Mossi went so far as to testify before the Costa Rican Congress on May 20, 2024 in connection with these efforts.

135.    Mossi is engaged in this targeted pressure campaign to cause CABEI to fear further economic harm if it does not pay to silence him by settling claims that are meritless. Mossi has made his price clear in the sham claim he filed against CABEI on July 1, 2024. Mossi's demand before the CCJ seeks $2,375,810 in purported reputational and moral damages plus interest and $714,543 for trial costs. In total, Mossi seeks $3,096,353 in the claims filed before the CCJ—a number untethered to anything except Mossi's own apparent financial needs.

136.    Concerned that Mossi's false and misleading statements would affect CABEI's stakeholders, including U.S. investors, CABEI has been forced to take corrective action at significant expense.

137.    Accordingly, Mossi has knowingly, deliberately, and unlawfully obstructed and affected commerce through extortion within the meaning of 18 U.S.C. § 1951. Even now, Mossi is attempting to pressure CABEI into relinquishing property by threatening and causing fear of economic harm.

*Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§1341, 1343*

138.    Mossi has also committed multiple acts of wire fraud and mail fraud in the course of a fraudulent scheme to misuse the Bank's resources for his own benefit. Mossi knew that in the 60-year history of the Bank, only two Executive Presidents had served two terms, so anticipating

the news that his term would likely not be renewed, Mossi committed himself to developing a relationship with Cenntro for his own personal gain—and used CABEI's reputation and funds to do so. Mossi secured a lucrative position importing EVs from Cenntro by turning the Bank's resources and goodwill to his own advantage on false pretenses that CABEI would offer financing for the deals he was setting up for his own benefit. For example, Mossi pushed CABEI to sponsor an EV conference in Washington, D.C. which Mossi used to benefit Cenntro and to allow him to deepen his relationship with Cenntro. Mossi also directed the misuse of Bank funds to purchase two EVs from Cenntro, based in New Jersey. Such acts were all designed to set up for himself a lucrative exit opportunity for Mossi and his company SOLMECA as an importer of Cenntro vehicles.

139.    To give his scheme to defraud CABEI credibility, Mossi set up the Cenntro deal on the false pretense that the Bank would be involved in financing or subsidizing any Cenntro vehicles the taxi collectives committed to purchase. Mossi reportedly offered one taxi cooperative leader a financial package that priced the electric vehicles between USD $23,000 and $26,000, which CABEI would subsidize to reduce the sales price by approximately USD $5,000. On October 4, 2023, just a couple of months prior to his departure, Mossi emailed Romero saying, "I am delighted we are moving forward with this first transaction for 50 taxis, yet, the potential is a market of 50,000 taxis in Honduras only. Let us know how the transaction advances, since we are fully behind the financing." These communications confirm that Mossi was using the promise of CABEI's resources to set up the Cenntro deal on false pretenses that the Bank was fully committed to financing the purchases. And he was also negotiating prices that were higher than what he had previously cited as the "market" price – to the detriment of CABEI and benefit of Cenntro.

140.   After leaving CABEI, Mossi set up SOLMECA in February 2024, which has since started handling the distribution and servicing of Cenntro electric vehicles in Honduras, and specifically for the taxi cooperative operating the Tegucigalpa-Palmerola route in Honduras, a deal Mossi pursued for himself ostensibly for CABEI's benefit while still at CABEI on the fraudulent pretense that the Bank would provide financing for the vehicles.

141.   Mossi used interstate and foreign wires to further his scheme to defraud CABEI in order to obtain money for himself, including by repeatedly emailing Cenntro personnel in the U.S. in order to further that scheme. For example, on November 29, 2022, Mossi emailed McInerney, who was located in Washington D.C., saying: "You don't know how happy I am about our meeting and your products. Could you please send me a proposal for a couple of your cars, so perhaps we can order them before the year closes? I would be interested in the plain delivery car, the one with the covered delivery cart, and the one that manages to distribute the cold chain for products like milk, poultry, or fish." Then on December 29, 2022 Mossi again emailed McInerney and Romero, suggesting the following: "[P]erhaps we can certainly plan for a show of your capabilities in Honduras, where our footprint is larger. We do have the interest in buying more for pilot programs and would love to have you meet with local entrepreneurs some time."

142.   In the course of making these wire transmissions, Mossi fraudulently omitted that his true reason for encouraging CABEI's business with Cenntro, at the expense of its business with other U.S.-based EV companies, was to better his personal financial position, and not to aid CABEI's business efforts in the domestic EV market. In short, each of these emails was sent as part of a fraudulent scheme to enrich himself on the false pretense of CABEI's involvement in the deals, in violation of 18 U.S.C. § 1343.

143.    Mossi also took to U.S. social media sites to further his scheme. For example, on January 27, 2024, Mossi posted on LinkedIn: "[I]f CABEI acts in this unilateral and arbitrary manner without due process, with whoever was its highest authority and legal representative, how do you think that a foreign investor would be interested in buying bonds from an institution that does not pay its obligation in a timely manner?" He made this statement knowing that investors would pay attention to his social media accounts given that he is CABEI's former executive and likely had non-public information. As a result, CABEI has had to spend resources on attorneys' fees for the bond offering and on increasing the offering interest rate—all in an effort to minimize the harms of Mossi's statements on CABEI's bond offering in the U.S. market.

*Domestic Injury*

144.    As a result of this pattern of racketeering activity, CABEI has suffered economic harms in the United States. Critically, Mossi's actions satisfy many of the criteria courts consider relevant to domestic injury, including that (1) many of the activities giving rise to this dispute occurred in or have a nexus with the U.S.; (2) CABEI received and expected to receive benefits associated with the interfered with business relationships in the U.S.; and (3) CABEI suffered injuries in the U.S., in addition to other relevant activities, including (4) that many of the services giving rise to the harm were performed in the U.S.; and (5) the U.S. is the location to which Mossi directed his conduct.

145.    ***The location of activities giving rise to the underlying dispute***. Mossi directed emails and social media posts to recipients and servers located in the United States in furtherance of his scheme to extort and defraud CABEI. And Mossi, under the guise of furthering the interests of CABEI, caused CABEI to host a "business forum" in Washington D.C. that promoted Cenntro and caused CABEI to buy electric vehicles and chargers at a cost of over $60,000 from the New

Jersey-based company. Further, Mossi sent various emails both within and without the U.S. to Cenntro, as pleaded above, in order to further his fraudulent scheme of depriving CABEI of business relationships

146.    Mossi's scheme would not have worked without his activities furthering his connection with the New Jersey-based start-up—Cenntro—which has manufacturing facilities in the United States. Mossi knew that in order to succeed in the EV business, "[b]etter access to the US market [was] essential" for CABEI, so all benefits associated with the scheme stemmed from developing relationships with U.S.-based companies and arose from Mossi's conduct directed at those domestic business relationships.

147.    While Mossi purported to be developing the relationship with Cenntro for CABEI's benefit, he was in fact developing it for his own benefit, and CABEI did not benefit from it at all. Rather, Mossi's scheme cost CABEI the funds it paid to Cenntro in the U.S. While CABEI expended significant resources to develop relationships with more established U.S. automakers such as Tesla and Detroit-based automakers, Mossi's prioritization of Cenntro squandered the opportunities CABEI had with these bigger and better-established companies to a degree likely only Mossi—as CABEI's Executive President at the time—is aware of. This caused CABEI harm with respect to its EV initiatives, which were focused on the United States.

148.    Additionally, as part of his scheme to extort CABEI, as described above, Mossi posted online to disparage CABEI's business reputation in the United States, which had direct and intended effect of devaluing CABEI's bond offering. Mossi did this as part of his ongoing scheme of disparaging CABEI to extort it into settling a baseless and frivolous lawsuit.

149.    ***Location of expected benefits.*** CABEI had Mossi act on its behalf towards U.S. EV companies, both within the United States and outside the United States, expecting that Mossi

would further CABEI's business relationships with domestic EV companies. Instead, Mossi defrauded CABEI by leading it to believe he would further CABEI's business relationships in the domestic EV market while instead solely focusing on developing a relationship with Cenntro for his own benefit. This harmed CABEI's existing business relationships with domestic EV companies and deprived it of key business opportunities.

150.    *Location of services that gave rise to harm.* CABEI employed Mossi and had him engage his services towards domestic EV companies within the United States. As described above, Mossi sent many emails both from within and without the United States to Cenntro and other U.S.-based parties. Under the auspices of being CABEI's Executive President, Mossi organized and ran a conference for EV manufacturers in Washington, D.C.

151.    *Target of Mossi's conduct*. Furthermore, Mossi sent multiple emails to CABEI's established business partners to attempt to induce them to distance themselves from CABEI. Mossi's statements to these business partners were made with full awareness that they intended to engage in CABEI's business efforts, that such involvement would benefit CABEI, and that his statements would hinder or prevent that involvement. In short, Mossi's emails to U.S. bankers and investors were intended to damage CABEI'S business relationships with its U.S. partners and thus cause CABEI economic harm.

152.    Mossi also targeted investors in the domestic bond market through his social media posts disparaging CABEI by posting: ""[I]f CABEI acts in this unilateral and arbitrary manner without due process, with whoever was its highest authority and legal representative, how do you think that a foreign investor would be interested in buying bonds from an institution that does not pay its obligation in a timely manner." Mossi knew CABEI would soon be making a bond offering in the U.S.

153.    ***The location of CABEI's injury.*** Mossi's scheme caused harm to CABEI's business interests and business relationships within the domestic EV market and harmed CABEI's business standing in that market in the United States. Mossi's prioritization of his self-serving relationship with Cenntro at the expense of relationships with better-established companies resulted in the loss of business opportunities with key U.S. companies.

154.    Additionally, Mossi as part of his pattern of racketeering squandered CABEI's opportunity to enter into an Action Plan with the USTDA, which has caused CABEI to lose significant business opportunities in the United States.

155.    Further, Mossi injured CABEI's domestic bond offering by making disparaging and false statements that caused CABEI have to raise the interest rate of a 2024 U.S. Bond Offering. Mossi's false statements also forced CABEI to spend additional money on professional services in light of Mossi's disparagement aimed at its bond offering.

156.    CABEI has also had to expend significant money to investigate the extent of Mossi's wrongdoing, to defend itself against the baseless legal claims and threats Mossi has leveled, and to redress the harms Mossi inflicted, and has paid lawyers and others out of a U.S. account.

## SECOND CAUSE OF ACTION
## Manipulation of the Market (D.C. § 31-5605.03)

157.    CABEI repeats and incorporates the allegations above as if set forth herein.

158.    D.C. Section 31-5605.03 ("Manipulation of Market") prohibits any person from "employ[ing] any deceptive or fraudulent device, scheme, or artifice to manipulate the market for a security" either "directly or indirectly, in the District." *Id.*

159.    Mossi is domiciled in Washington, D.C. and has spent significant time in Washington, D.C. over at least the last eight years.

160.    Mossi made false and deceptive statements of material fact about CABEI to the public. As set forth previously, Mossi falsely claimed, both directly and by implication, that CABEI:

      a.    does not conduct adequate diligence before making loans;

      b.    mismanages public funds;

      c.    lends money based on corrupt preferences; and

      d.    will not responsibly pay its debts or obligations.

161.    In advance of CABEI's 2024 USD Bond Offering, Mossi reached out to one of CABEI's business partners in New York at a major investment bank that had previously invested in CABEI's bonds, to suggest that CABEI's new Executive President was operating the Bank recklessly and without a strategy, with the intent of causing market participants to lose faith in CABEI's institutional strength. Mossi's false accusations about CABEI forced CABEI to spend extra resources to conduct diligence calls to ensure investor confidence in its bond offering.

162.    As the former Executive President of the Bank, Mossi is knowledgeable that the United States was the market for CABEI's bonds and was well aware of the impact his statements, as former Executive President, could have on CABEI. Mossi knowingly attempted to manipulate the market for CABEI's 2024 USD Bond Offering by making misleading and/or false statements about the Bank's diligence related to loans, its mismanagement of public funds, its corrupt lending practices, and the Bank's overall management situation.

163.    Because Mossi is CABEI's former Executive President, institutional investors could reasonably believe he had actual knowledge to support his false claims and rely on those statements to CABEI's detriment. As a direct and proximate result of Mossi's conduct, CABEI

had to spend additional financial and other resources restoring the relationships he intentionally tarnished.

164.    The foregoing course of conduct by Mossi violated D.C. § 31-5605.03. Accordingly, CABEI is entitled to damages.

### THIRD CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations

165.    CABEI repeats and incorporates the allegations above as if set forth herein.

166.    Among other financial services, CABEI sells bonds to investors globally, including to qualified institutional buyers in the United States, with whom CABEI has had longstanding business relations.

167.    The purchase of CABEI's bonds by investors confers a benefit upon CABEI that is expected to continue prospectively.

168.    CABEI has prospective business relations with many third parties, including but not limited to, current and potential institutional investors in the United States.

169.    Serving as the Executive President of CABEI for five years, Mossi knew or should have known about CABEI's prospective business relations with many third parties.

170.    Serving as the Executive President of CABEI for five years, Mossi also knew of CABEI's 2024 USD Bond Offering.

171.    Upon information and belief, Mossi intentionally attempted to induce CABEI's established business partners to distance themselves from CABEI through Mossi's false, misleading, defamatory, and/or disparaging statements about CABEI. Mossi's statements to these business partners were made with full knowledge that they were planning to participate in CABEI's endeavors, that such participation would benefit CABEI, and that his statements would delay or thwart that participation. Mossi engaged in this conduct at least with respect to one of

CABEI's major business partners in New York (*supra* ¶ 95) that was a purchaser and potential purchaser of CABEI's bonds, credit ratings agencies (*supra* ¶ 78), and perhaps others, entities with whom Mossi knew that CABEI had ongoing relationships. Mossi's interference in these relationship caused CABEI increased diligence costs with respect to its 2024 bond offering, and other damage, determining the full extent of which will require discovery into Mossi's actions.

172.    CABEI suffered direct harm from Mossi's intentional interference with CABEI's prospective business relations, including spending additional resources to successfully launch its 2024 bond offering and increased costs related to renegotiating the terms of the offering and necessary federal disclosures. Accordingly, CABEI is entitled to damages.

### FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty

173.    CABEI repeats and incorporates the allegations above as if set forth herein.

174.    As the Executive President of CABEI, Mossi owed CABEI duties of loyalty and care as a fiduciary. By virtue of his business dealings on behalf of CABEI with CABEI's business partners, investors, and members of the public, Mossi was CABEI's agent. By virtue of access to and use of confidential and proprietary CABEI information, and his signing of a confidentiality agreement, CABEI trusted Mossi with sensitive Bank information and access to discretionary funds.

175.    Mossi breached those duties as a fiduciary by knowingly and intentionally disclosing the Bank's confidential information. For example, Mossi publicly discussed the dismissal of thirteen CABEI employees and the fact that other employees were waiting for their contracts to be signed—sensitive HR information that he had inside knowledge about only by virtue of his employment at CABEI. He also recently disclosed confidential financial information related to CABEI's purported disbursements to member countries.

176.    Mossi further breached his fiduciary duties by operating under a conflict of interest while still at the Bank, working on deals with Cenntro that he intended to use to benefit himself after his departure, and failing to disclose conflict of interest to the Bank. Mossi's intent to utilize his position at the Bank to benefit himself is apparent given that he now serves as a consultant and importer for Cenntro and is working on a deal to purchase Cenntro vehicles for a Honduran taxi company—a deal he originated while at the Bank, using Bank resources. Mossi further breached those duties through his own self-dealing conduct when he used CABEI funds to make multiple purchases of electric vehicles from Cenntro without disclosing his conflict of interest or his status as an investor, and therefore abusing the discretion he had as Executive President.

177.    Mossi further breached his fiduciary duties by knowingly and intentionally making false statements about the Bank to credit rating agencies in the United States while he still served as Executive President in order to harm the Bank's credit rating. On information and belief, in or around September of 2023, Mossi abused his title as outgoing Executive President, hid the fact that he had not been renewed for a second term, and visited credit rating agencies in New York, including Moody's, for the purpose of harming the Bank's credit rating and, with that, its ability to operate.

178.    Mossi further breached his fiduciary duties when he knowingly and intentionally made false statements about the Bank and the election process for the Executive President both on television and on social media, while he served as Executive President. Mossi made these statements as a fiduciary for the Bank in order to harm the Bank, its reputation, and its ability to operate.

179.    Mossi further breached his fiduciary duties when he knowingly and intentionally usurped opportunities CABEI may have had to conduct business with Cenntro. As CABEI's

fiduciary, Mossi had a responsibility to "disclose and tender the opportunity" to the Bank, but he failed to do so.

180.    CABEI suffered direct harm from Mossi's breach of fiduciary duties and self-dealing, including but not limited to reputational harm associated with his conduct, in addition to loss of funds related to Mossi's improper use of Bank resources to fund the purchase of multiple electric vehicles.

## FIFTH CAUSE OF ACTION
### Breach of Contract

181.    CABEI repeats and incorporates the allegations above as if set forth herein.

182.    As part of his employment with CABEI, Mossi assented to a valid and binding contract obligating him to keep certain information confidential. Specifically, the Pledge of Loyalty and Confidentiality states that he would "refrain from communicating confidential information to persons outside the Bank," and that he would not "make use for my personal benefit of the information that I learn by reason of my position." In another agreement Mossi signed, Mossi agreed that his "obligation of confidentiality . . . shall subsist for up to ten years after the termination of [his] employment."

183.    Mossi has publicly acknowledged his binding "confidentiality agreement not to share CABEI documents." *See supra* ¶ 93.

184.    Similarly, as an employee, Mossi was bound by CABEI's Code of Ethics, which requires every "member of the Bank's staff" to "behave" in ways showing "commitment and loyalty or faithfulness towards the [Bank], as well as towards its colleagues, fostering a positive institutional image in all of his/her behaviors, avoiding comments or actions that can cause damage to the Bank. Personal activities must be characterized by due discretion and confidentiality in the

handling information and other matters of an institutional nature." CABEI Code of Ethics Ch. II, Art. 7-06(c).

185.    On October 10, 2018, while in Washington, D.C., Mossi signed the Certificate of Acceptance of the Code of Ethics. Specifically, he "declared irrevocably and without any restriction, that [he] received the Code of Ethics of [CABEI] and that [he is] familiar with the principles, standards, and ethical values contained therein." He further agreed "to respect and faithfully comply with its contents and recognize[d] that failure to comply with it may result in disciplinary sanctions, including dismissal, without prejudice to any criminal and civil actions that may be pertinent."

186.    Mossi breached these agreements. As previously described, Mossi has repeatedly breached the duty of confidentiality by making public statements about matters he agreed to keep confidential per his agreements. Those statements include, but are not limited to, those about supposed "labor liabilities of thirteen staff and contractors" of CABEI as well as confidential information about the Bank's disbursements.

187.    By virtue of these violations, CABEI suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Plaintiff CABEI prays for relief as follows:

188.    An award of damages in an amount to be proven at trial;

189.    An order compelling Defendant to disgorge all ill-gotten gains, illegal losses avoided, and unjust enrichment that Defendant obtained as a result of his fraudulent statements, acts, or courses of conduct described in this Complaint;

190.    Treble damages as permitted and required by law, including pursuant to 18 U.S.C. § 1964(c), in an amount to be proven at trial;

191.    An award of punitive and/or exemplary damages as permitted by law in an amount

to be proven at trial;

192.    Injunctive relief enjoining Defendant from continuing his unlawful conduct;

193.    Declaratory relief;

194.    An award of prejudgment interest; and

195.    An award of attorneys' fees, costs, and/or interest as permitted by law.


Dated: December 9, 2024                    GIBSON, DUNN & CRUTCHER LLP


                                           */s/ Lee R. Crain*
                                           Lee R. Crain (D.D.C. Bar No. NY0337)
                                           Anne Champion
                                           (*pro hac vice*)
                                           Robert Giannattasio
                                           (*pro hac vice*)
                                           Azucena Marquez
                                           (*pro hac vice*)
                                           200 Park Avenue
                                           New York, NY 10166-0193
                                           Telephone: 212.351.5361
                                           Email: LCrain@gibsondunn.com
                                           Email: AChampion@gibsondunn.com
                                           Email: RGiannattasio@gibsondunn.com
                                           Email: AMarquez@gibsondunn.com

                                           *Attorneys for Plaintiff*