**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CENTRAL AMERICAN BANK FOR ECONOMIC INTEGRATION**, |
| Plaintiff, |
| v. |
| **DANTE MOSSI**, |
| Defendant. |

Case No. 24-cv-2544 (CRC)

## <u>MEMORANDUM OPINION</u>

In 2018, Plaintiff Central American Bank for Economic Integration ("CABEI" or "the Bank") named Defendant Dante Mossi as its Executive President. Though the relationship started off well, it soured over the course of Mossi's five-year term. CABEI eventually filed suit, alleging that Mossi's conduct toward the end of his tenure and immediately afterward violated civil provisions of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO Act" or "RICO"), as well as one provision of the D.C. Code and the common law. Mossi now moves to dismiss the suit on the grounds that (1) this Court lacks personal jurisdiction over him and (2) CABEI's complaint fails to state a civil RICO claim, among other defects.

Concluding that it may exercise personal jurisdiction over Mossi under Federal Rule of Civil Procedure 4(k)(2), but that CABEI's complaint fails to state a civil RICO claim, the Court will grant Mossi's motion and dismiss the case.

## I.    Background

### A.  Factual Background

CABEI is a regional development bank that is headquartered in Honduras and offers its member countries access to financing for economic development projects.  First Amended Complaint ("FAC") ¶¶ 11, 30–31.  In October 2018, CABEI's Board of Governors elected Mossi to serve as the Bank's Executive President for a five-year term.  Id. ¶¶ 33, 38.  CABEI now alleges that Mossi carried out a "fraudulent and extortionate scheme" that started during his tenure and continued after his acrimonious departure from the Bank.  Id. ¶ 1.

For purposes of assessing the present motion to dismiss, there are four sets of pertinent facts.  The Court surveys each in turn.

### 1.  Mossi's General Connections with the U.S.

CABEI alleges that, since 1993, Mossi "has continuously maintained home addresses and mailing addresses in various states across the United States."  Id. ¶ 17.  The complaint states that he purchased a home in Virginia in 2012 and operated a family business with a Virginia mailing address from 2014 to 2015.  Id. ¶¶ 17–20.  Mossi then worked at the World Bank's Washington, D.C. headquarters from 2016 to 2018; during this time, he lived in an apartment that he still owns today, id., and he continues to receive income in D.C. through his World Bank pension, id. ¶¶ 19–20.  When Mossi began to look for new positions at the end of his tenure with CABEI, the complaint states that he listed his D.C. address as his home address.[1]  Id. ¶ 20.

---

[1] In an affidavit, CABEI's process server averred that he went to Mossi's D.C. apartment in order to serve him.  After arriving at the building, the process server "spoke to Dante Mossi over the callbox who stated that he would send someone down to the lobby to retrieve the documents," but Mossi "refused to provide his apartment number."  Affidavit of Ambiko Wallace at 1.  The process server went upstairs, saw a man come out of an apartment, and asked if he was sent by Mossi.  The process server then "asked if Mr. Mossi lived in Apt. 4D and [the man] replied yes."  Id.

CABEI also alleges that Mossi regularly travels to the U.S. and the District of Columbia. According to the Bank, "U.S. government records" reflect that Mossi made at least several trips each year to the U.S. during and after his term at the Bank, with over ten in some years, and stayed in the country for an average of two months annually.  Id. ¶ 21.  The complaint notes that some of this travel may have been for medical care, but based on social media posts, other time was spent doing business—for instance, visiting an electric vehicle factory—and carrying out various "everyday activities" in Virginia, Florida, and California.  Id. ¶ 22.

Mossi submitted a declaration alongside his motion to dismiss that tells a slightly different story:  He avers that he is a Honduran citizen who worked "for approximately 15 years . . . with the World Bank in various posts in [his] home country of Honduras and elsewhere."  Declaration of Dante Mossi ("Mossi Decl.") ¶ 3.  "With the exception of occasional business-related and personal travel, since leaving the World Bank," Mossi declares that he has "spent all of [his] time in Honduras."  Id.  Mossi explains that he still visits the District of Columbia every six months to be treated by a medical specialist but in recent years has stayed in the U.S. for no more than two months each year, "with the exception of 2021, when [he] was forced to prolong [his] stay after contracting COVID and suffering from a stroke."  Id. ¶ 9. Though Mossi affirmatively states that has not "lived in [his D.C.] apartment since 2018," his declaration does not pinpoint where he stays during the several weeks he spends in the U.S. every year.  Id. ¶ 8.  Mossi does say, however, that "a number of [his] 'entries' into the U.S., as shown in government records that CABEI apparently has access to, reflect brief layovers during transit to or from Honduras and a third country rather than travel to the U.S. in the traditional sense."  Id. ¶ 9.

Mossi's declaration further explains that before starting as Executive President at CABEI in late 2018, he executed his employment contract and a loyalty and confidentiality pledge in D.C.  The pledge stipulated, among other things, that his "migration status is not of a resident of the United States of America" and that he was not "requesting residency status in the United States of America."  Id. ¶ 5.  Mossi understands that he was required to make this pledge because CABEI does business with Cuba, and the Office of Foreign Assets Control "prohibits U.S. persons from conducting business with Cuba."  Id. ¶ 6.

### 2.  *Mossi's Dealings with Cenntro*

CABEI's civil RICO claim rests mainly on Mossi's alleged efforts to "enrich himself through his position at CABEI."  FAC ¶ 1.  According to the Bank, the vehicle for Mossi's self-enrichment was a business relationship he aggressively pursued with Cenntro, an American electric vehicle ("EV") company that is incorporated in Nevada, headquartered in New Jersey, and has manufacturing facilities in China and the U.S.  Id. ¶ 46.

To begin, CABEI alleges that "as part of [the Bank's own] ongoing initiatives . . . , [it] sought to expand EV infrastructure throughout the region."  Id.  To this end, the Bank "worked to forge relationships in the EV sector by conducting business meetings with domestic EV producers across the U.S., including several Detroit-based automakers and Tesla," and Mossi was present at these meetings.  Id. ¶ 49.  But Mossi purportedly began to favor Cenntro over other competitors, notwithstanding the fact that it had a "short track record and few vehicles on the road."  Id. ¶ 50.

In November 2022, "at Mossi's urging," CABEI sponsored an EV conference in D.C. that was meant to "connect" domestic EV companies, "such as Tesla and General Motors, with Central American entrepreneurs."  Id. ¶ 52.  Representatives from Cenntro attended the

conference "among much more recognized companies." Id.  The forum featured U.S. Assistant
Secretary of State Geoffrey Pyatt, and Mossi opened the event by "announc[ing] plans to use
Bank resources to finance millions in EV investments," including "U.S. EV purchases." Id.  The
complaint notes that "[t]hroughout the conference, Mossi worked to encourage U.S. and regional
stakeholders to further invest in the Central American EV industry, and Cenntro in particular."
Id.

 Mossi and D.C.-based Cenntro executive Marianne McInerney interacted at the EV
conference, where she remarked that she would "love Dr. Mossi to help facilitate a meeting with
[Central American taxi] fleet managers if [he had] time in the future." Id. ¶ 53 (first alteration in
original).  Mossi, McInerney, and other Cenntro personnel corresponded for months after the
conference, with Mossi expressing interest in demonstrating the company's "capabilities" in
Honduras; the talks culminated in Mossi's use of CABEI's discretionary funds to purchase two
Cenntro vehicles that were delivered to the Bank's headquarters in Honduras in March 2023. Id.
¶¶ 53–59.  According to the complaint, Mossi disregarded other business opportunities related to
electric mobility—such as a partnership with the U.S. Trade and Development Agency
("USTDA")—because he was focused on setting up an "exit opportunity for himself using the
Bank's resources." Id. ¶¶ 60–61.

 In May 2023, CABEI's Board of Governors officially declined to confirm Mossi for a
second five-year term, meaning that his time as Executive President would expire in November
of that year. Id. ¶ 63.  For the remainder of his term, Mossi continued to communicate with
Cenntro executives about potential business in Central America, including the possibility that
taxi cooperatives in Honduras and Belize could purchase a fleet of Cenntro vehicles with
supportive financing from CABEI. Id. ¶¶ 64–73.  After parting ways with CABEI, Mossi

created and now continues to operate SOLMECA, a company that handles "the distribution and servicing of Cenntro electric vehicles in Honduras." Id. ¶ 116.

### 3. Mossi's Public Remarks About CABEI

CABEI's complaint details a second course of conduct that began once the Board of Governors decided to elect a new Executive President: Mossi's purported "smear campaign" against the Bank. Id. ¶ 75. Just a few days after the Board's announcement that Mossi's term would not be renewed, Mossi convened an all-employees meeting and accused the Board of "not being transparent in its election process." Id. CABEI alleges that in September 2023, Mossi "attempted to visit credit rating agencies in New York, including Moody's, for the purpose of negatively influencing their decisions affecting" the Bank. Id. ¶ 77. And while still Executive President, Mossi decried a lack of democracy and transparency at CABEI on social media and in Central American news outlets. Id. ¶¶ 78–79.

After Mossi's term ended, CABEI claims that he intensified his public attacks on the Bank, including around the time of its annual bond offering. Id. ¶ 97. Mossi posted numerous times on social media (including X and LinkedIn) and spoke in traditional media about, among other things: corruption and collusion at the Bank, a lack of due diligence in its financing, poor portfolio performance, internal upheaval among personnel, and the Bank's purported violations of employees' labor rights. Id. ¶¶ 86–114.

CABEI also alleges that Mossi reached out to CABEI's competitors and business partners, including a major New York investment bank, to lament the change in the Bank's leadership. Id. ¶ 94. Mossi contacted these partners just before CABEI was scheduled to issue its 2024 U.S. bond offering, "caus[ing] the Bank to have to have to expend time and resources to conduct additional diligence calls" and to "raise the interest rate" on the offering. Id. ¶¶ 95, 155.

6

Mossi continued to publicly criticize the Bank for several months. In May 2024, Mossi testified before a commission of the Costa Rican Congress, blaming CABEI for mishandling loans requested by the government. Id. ¶ 108. And in August, CABEI alleges, Mossi posted confidential information about the Bank's disbursements to member countries on X. Id. ¶ 114.

### 4. *Mossi's Legal Dispute with CABEI in Nicaragua*

With CABEI and Mossi's relationship at an end, the parties are now entangled in at least one legal dispute abroad. CABEI's complaint alleges that, while still at the Bank, Mossi "hired a lawyer to assess the Board of Directors' decision not to renew his term as Executive President" and paid the lawyer $6,000 in fees using CABEI funds; the Bank later withheld this sum from Mossi's severance, claiming the expense was never approved, and he threatened to sue. Id. ¶ 81. Mossi posted several times about the withheld severance on social media in early 2024, suggesting that it symbolized the institution's endemic lack of transparency. Id. ¶¶ 132–33. CABEI alleges that Mossi made at least one of these posts while in the U.S. and "directed the statements at U.S. investors when CABEI was actively marketing its bonds." Id. ¶ 133.

Eventually, Mossi filed a demand in the Central American Court of Justice, which is based in Nicaragua, claiming that CABEI had wrongfully withheld a portion of his severance and damaged his reputation and seeking $2,375,810 in "reputational and moral damages." Id. ¶¶ 105, 135. Mossi's declaration elaborates that this proceeding seeks relief from CABEI "for erroneously making allegations of responsibility of not following internal bylaws and creating a loss to the assets of CABEI."[2] Mossi Decl. ¶ 11.

---

[2] Aside from this pending legal proceeding, CABEI also suggests that Mossi's posts and public utterances about unspecified "irregularities" associated with the Bank's loans to Costa Rica could lead to "bogus investigations" by that country's government. FAC ¶¶ 99–100, 129, 134.

B.  Procedural History

CABEI sued Mossi in September 2024, alleging that he violated the RICO Act, engaged in unlawful market manipulation in contravention of the D.C. Code, and committed other common law violations.  Once CABEI filed its amended complaint, Mossi moved to dismiss for lack of personal jurisdiction and failure to state a claim.  On June 20, 2025, after initial briefing in this case was complete, the Supreme Court issued its decision in Fuld v. Palestine Liberation Org., 606 U.S. 1 (2025), holding that the Fourteenth Amendment's minimum contacts standard does not apply where a court is assessing whether the exercise of personal jurisdiction over a defendant is consistent with the Fifth Amendment Due Process Clause; instead, personal jurisdiction is evaluated under "a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority," id. at 16.  Given Fuld's potential impact on the personal jurisdiction analysis in this case, this Court solicited supplemental briefing.  The parties filed additional briefs and replies discussing Fuld.  The Court then heard argument on Mossi's motion to dismiss on September 3, 2025.

**II.  Legal Standard**

Mossi seeks to have this case dismissed for lack of personal jurisdiction, see Fed. R. Civ. P. 12(b)(2), and failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6).

"On a motion to dismiss pursuant to Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for a court's exercise of personal jurisdiction over the defendant." Stocks v. Cordish Companies, Inc., 118 F. Supp. 3d 81, 86 (D.D.C. 2015).  "To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff may not rely on conclusory allegations, but instead must make a showing of the facts necessary to connect each defendant to the forum."

<u>Devorah v. Royal Bank of Canada</u>, 115 F. Supp. 3d 35, 38 (D.D.C. 2015) (Cooper, J.).  "[W]hile the Court must resolve factual discrepancies in favor of the plaintiff, it need not accept the plaintiff's factual allegations as true," <u>Swecker v. Midland Power Coop.</u>, 253 F. Supp. 3d 274, 278 (D.D.C. 2017) (Cooper, J.) (citation omitted), and "may consider affidavits and other materials to determine the exercise of jurisdiction," <u>Stocks</u>, 118 F. Supp. 3d at 86.  As for a motion to dismiss pursuant to Rule 12(b)(6), the familiar standard applies:  The complaint must contain sufficient factual matter to state a plausible claim for relief, and the court "must accept all non-conclusory allegations of fact contained in a complaint and draw all reasonable inferences in favor of the plaintiff."  <u>Devorah</u>, 115 F. Supp. 3d at 38 (citation omitted).

### III.    Analysis

#### A.    <u>Personal Jurisdiction</u>

The threshold question in this case is whether the Court may exercise personal jurisdiction over Mr. Mossi.  CABEI's complaint identifies several possible statutory bases for jurisdiction.  <u>See</u> FAC ¶ 16.  The Court determines that it may exercise personal jurisdiction over Mossi under Fed. R. Civ. P. 4(k)(2) and so does not address alternative bases for personal jurisdiction, except as warranted by the analysis under that rule.

Rule 4(k)(2) is effectively a "federal long-arm statute."  <u>Hueter v. Kruse</u>, 610 F. Supp. 3d 60, 71 (D.D.C. 2022).  It "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States."  <u>Mwani v. bin Laden</u>, 417 F.3d 1, 10 (D.C. Cir. 2005).  The first two elements are not in

dispute here.  Thus, the applicability of Rule 4(k)(2) turns on the latter two factors.  The Court addresses each in succession.

### 1.   *Rule 4(k)(2)(A): The Negation Requirement*

Rule 4(k)(2) was enacted in 1993 to "correct[] a gap in the enforcement of federal law." Mwani, 417 F.3d at 10 n.9 (quoting Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments).  "Under the former [version of Rule 4], a problem was presented when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law . . . , but having insufficient contact with any single state to support jurisdiction under the state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction." Id. (quoting Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments).  Rule 4(k)(2) fixed this problem, and thus promoted the "ends of [certain] federal statutes," by preventing foreign defendants from evading the jurisdiction of American courts.  Id. at 10 (alteration in original) (quoting Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 111 (1987)).

Because Rule 4(k)(2) ensures that defendants with sufficient nationwide contacts do not fall through the cracks of other jurisdictional tests, in order for the rule to apply, "the defendant [may not be] subject to jurisdiction in any state's courts of general jurisdiction."  Fed. R. Civ. P. 4(k)(2)(A).  This is sometimes referred to as the "negation requirement."  Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico, 563 F.3d 1285, 1294 (Fed. Cir. 2009).  Of course, "[d]etermining whether a defendant is subject to the jurisdiction of a court 'of any state' presents no small problem."  Mwani, 417 F.3d at 11.  While a court could "ponderously 'traipse through the 50 states, asking whether each could entertain the suit,'" the D.C. Circuit has

adopted a "burden-shifting framework" to "avoid that daunting task." Id. (quoting ISI Int'l, Inc.

v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)).  Under that framework,

> A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other
> state in which the suit could proceed.  Naming a more appropriate state would
> amount to a consent to personal jurisdiction there (personal jurisdiction, unlike
> federal subject-matter jurisdiction, is waivable).  If, however, the defendant
> contends that he cannot be sued in the forum state and refuses to identify any other
> where suit is possible, then the federal court is entitled to use Rule 4(k)(2).

 Id. (quoting ISI Int'l, Inc., 256 F.3d at 552).  In other words, "so long as a defendant does not

concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction."  Id.

(quoting Adams v. Unione Mediterranea Di Sicurta, 364 F.3d 646, 651 (5th Cir. 2004)).

Mossi has insisted that he cannot be sued in D.C. and does not identify any other U.S.

forum where suit would be appropriate.  See Def. Mot. to Dismiss at 22–23.  As a result, the

negation requirement is likely satisfied.  But because the parties sharply dispute whether Mossi

can be sued in D.C., the Court will take a slight detour to assure itself that Mossi lacks minimum

contacts with the District under D.C.'s general and specific personal jurisdiction statutes.

### a.  General Jurisdiction under D.C.'s Long-Arm Statute

To begin, it is clear that a District of Columbia court could not exercise *general*

jurisdiction over Mossi.  According to D.C.'s long-arm statute, a local court possesses

jurisdiction over a defendant who has an "enduring relationship" with the District—i.e., when he

is "domiciled" there.  D.C. Code § 13-422.  Domicile, in turn, "is determined by two factors:

physical presence in a state, and intent to remain there for an unspecified or indefinite period of

time." Prakash v. Amer. Univ., 727 F.2d 1174, 1180 (D.C. Cir. 1984).  "[A] person . . . may

have only one domicile." Core VCT Plc v. Hensley, 59 F. Supp. 3d 123, 126 (D.D.C. 2014); see

also Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989) ("One acquires a

'domicile of origin' at birth, and that domicile continues until a new one . . . is acquired.").

11

Although CABEI doggedly maintains that Mossi is domiciled in the District, the Bank does not establish that Mossi has been physically present and intent on remaining here at *any* point relevant to this litigation. True, Mossi owns an apartment in D.C.; regularly travels here for medical care and other activities; continues to receive income from his World Bank pension; and listed his D.C. address on at least one job application after he left CABEI. These contacts suggest that Mossi is a frequent visitor who is open to work in the District and may reside here again if a professional opportunity materializes. But they are wholly insufficient to render him "at home" in the District. See, e.g., Nuevos Destinos, LLC v. Peck, No. 15-cv-1846, 2019 WL 78780, at *6 (D.D.C. Jan. 2, 2019) (declining to exercise general jurisdiction over Peruvian defendants on the basis of incidental U.S. contacts, such as medical, leisure, and business visits, that were not sufficiently "continuous and systematic" as to render the defendants "essentially *at home* in the United States"); Queen v. Schmidt, Nos. 10-cv-2017, 11-cv-2117, 2015 WL 5175712, at *5 (D.D.C. Sep. 3, 2015) ("Although the plaintiffs have submitted a deed in [defendant's] name indicating her ownership of a D.C. home, ownership does not equal domicile."). The allegations and declarations before the Court do not indicate that Mossi substituted his domicile in Honduras for domicile in D.C. during the pertinent time period.

> b.  Specific Jurisdiction under D.C.'s Long-Arm Statute

Although a closer question, in this Court's view, a D.C. court also could not exercise *specific* personal jurisdiction over Mossi pursuant to the provisions of the D.C. Code that CABEI invokes. See FAC ¶ 16. The D.C. long-arm statute provides for specific jurisdiction where, among other things, a defendant has (1) "transact[ed] any business" in D.C.; (2) "caus[ed] tortious injury" in D.C. "by an act or omission" in the District; or (3) "caus[ed] tortious injury" in D.C. by an "act or omission" outside D.C. if the defendant "regularly does or solicits business,

engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(1), (3), (4).  The defendant's conduct in or related to the District must give rise to the plaintiff's "claim for relief."  D.C. Code § 13-423(b); see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021) (court has specific jurisdiction where "plaintiff's claims . . . arise out of or relate to the defendant's contacts with the forum" (internal quotation marks omitted)).

In attempting to snag these jurisdictional hooks, CABEI relies principally on three of Mossi's contacts with D.C.:  He executed his initial employment contract with CABEI while still living in the District; he regularly contacted Ms. McInerney, who was based in D.C., to develop his relationship with Cenntro; and he had CABEI organize and pay for an EV conference in the District, where he deepened his business relationship with Cenntro.

The first and second contacts do not evince Mossi's "purposeful availment" of the District.  Ford Motor Co., 592 U.S. at 359 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  That Mossi signed his onboarding paperwork with CABEI in D.C. hardly represents Mossi's decision to "enter[] a contractual relationship centered" in the District; since CABEI has no office in the District, it was at best "fortuitous" that his contracts were executed here.  Id. (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)); see also Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004); Brunson v. Kalil & Co., Inc., 404 F. Supp. 2d 221, 228 (D.D.C. 2005).  The same goes for Mossi's communication with McInerney, who happens to have been based in the District.  Mossi advanced his relationship with Cenntro by communicating with personnel based across the U.S., and there is nothing in the complaint to suggest that he intentionally sought McInerney out based on her location.

That leaves the EV conference. Whether a defendant has "transact[ed] business" in the District depends on a number of factors, such as "the defendant's voluntary and deliberate reaching out into the District to contract with an organization here," "the defendant's attendance at meetings in the District," "the length of time for which the engagement lasted," "whether the defendant contemplated . . . that work . . . would be performed in the District," "whether the defendant derived economic benefit," and "whether the harm caused by the defendant is felt . . . in the District." Am. Action Network, Inc. v. Cater Am., LLC, 983 F. Supp. 2d 112, 119–20 (D.D.C. 2013). Courts are "particularly attentive" to the final "harm" factor, id. (quoting Thompson Hine LLP v. Smoking Everywhere, Inc., 840 F. Supp. 2d 138, 143 (D.D.C. 2012)), which dovetails with the long-arm statute's other jurisdictional requirement of "tortious injury" suffered in the District, see D.C. Code § 13-423(a)(3), (4). At root, courts must discern "whether the defendant's contacts with the forum are of such a quality and nature that they manifest a deliberate and voluntary association with the forum." Am. Action Network, 983 F. Supp. 2d at 119 (quoting Mouzavires v. Baxter, 434 A.2d 988, 995 (D.C. 1981) (en banc)).

These considerations cut both ways here. On one hand, CABEI hosted the EV conference "at Mossi's urging," and he opened the event by delivering some remarks to attendees. FAC ¶ 52. Mossi's briefing downplays the significance of the conference by calling it a one-off "car show." Def. Mot. to Dismiss at 15. According to plausible allegations in the complaint, however, Mossi did more than merely attend a "single meeting." Armco Steel Co., L.P. v. CSX Corp., 790 F. Supp. 311, 321 (D.D.C. 1991).

On the other hand, the complaint does not establish that Mossi's participation in the event "manifest[ed] a deliberate and voluntary association" with the District, especially because it says next to nothing about how the "harm caused by the defendant" was "felt . . . in the District"

specifically.  Am. Action Network, 983 F. Supp. 2d at 119 (citations omitted).  At best, CABEI alleges that "Mossi regularly made and continues to make false, misleading, and defamatory statements about CABEI and its business, . . . which Mossi knows and intends to have harmful and disruptive impacts on CABEI's business throughout the United States and *in Washington, D.C., in particular*."  FAC ¶ 25 (emphasis added).  But this statement is conclusory.  And tellingly, the facts included in the "domestic injury" section of the complaint's civil RICO section, see id. ¶¶ 144–56, focus on the U.S. as a whole, rather than the District.  Though "a small amount of in-jurisdiction business activity"—even "a single act"—may "be sufficient" to confer jurisdiction under D.C.'s specific jurisdiction statute, the Court does not view Mossi's involvement in the EV conference as "purposeful" enough to justify the exercise of specific jurisdiction.  Jackson v. Loews Wash. Cinemas, Inc., 944 A.2d 1088, 1093 (D.C. 2008) (citations omitted).[3]

Having come to the end of this analytical detour, the Court concludes that Rule 4(k)(2)(A)'s negation requirement is satisfied.  Not only does Mossi deny that any U.S. court has jurisdiction over him, see Mwani, 417 F.3d at 11, but he also lacks sufficiently deliberate contacts with the District to satisfy the parameters of its long-arm statute.

### 2.  Rule 4(k)(2)(B)

Rule 4(k)(2)(B) mandates that the exercise of personal jurisdiction be "consistent with the United States Constitution and laws."  Until recently, D.C. Circuit precedent dictated that this prong of the Rule 4(k)(2) inquiry is satisfied where the defendant has "sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process

---

[3] Should CABEI elect to refile its state law claims in D.C. court, the Court is careful to note that its conclusion here may be persuasive to, but of course would not bind, that court in the future.

Clause of the Fifth Amendment." Bernhardt v. Islamic Republic of Iran, 47 F.4th 856, 864 (D.C. Cir. 2022) (quoting Mwani, 417 F.3d at 11); see also Safex Found., Inc. v. SafeLaunch Ventures Ltd., 694 F. Supp. 3d 1, 9 (D.D.C. 2023) (Cooper, J.). In other words, Rule 4(k)(2)(B) imposes a nationwide minimum contacts test.

Earlier this year, however, the Supreme Court shook up personal jurisdiction doctrine by holding that "the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard," but instead "permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." Fuld, 606 U.S. at 23, 16. Without specifying the contours of this "more flexible jurisdictional inquiry," Fuld lowers the constitutional floor when it comes to evaluating a federal court's exercise of personal jurisdiction under the Fifth Amendment Due Process Clause. In so doing, the decision theoretically unsettles the D.C. Circuit's minimum contacts-based Rule 4(k)(2)(B) standard, even though Fuld did not squarely involve an application of that rule.

Despite the jurisprudential scramble, the Court need not divine the precise parameters of Fuld's "flexible jurisdictional inquiry" in order to resolve the personal jurisdiction question presented by this case. Any defendant possessing "sufficient minimum contacts with the [relevant] forum would also satisfy the more flexible personal jurisdictional standards set forth in Fuld." In re Fairfield Sentry Ltd., 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025). Thus, if Mossi satisfies the D.C. Circuit's comparatively stringent nationwide contacts test, he necessarily satisfies the more flexible inquiry alluded to in Fuld—whatever that may entail.

The Court therefore proceeds with the nationwide minimum contacts analysis. Because "the prospect remains that the Fifth Amendment might entail a[n] . . . 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case,'" the Court also considers

whether exercising personal jurisdiction over Mossi would be reasonable here.  Fuld, 606 U.S. at 23 (quoting Asahi Metal Indus. Co. v. Sup. Ct. of Cal., 480 U.S. 102, 115 (1987)).  Finally, the Court briefly addresses a new Rule 4(k)(2) argument that Mossi first raised at oral argument and concludes that it was forfeited.

a.  Nationwide Minimum Contacts Analysis

In this circuit, "[p]leading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim."  Bernhardt, 47 F.4th at 864.  "The plaintiff must show that the foreign defendant 'has purposefully directed his activities at residents of the forum,' and that the alleged injuries 'arise out of or relate to those activities.'"  Id. (quoting Mwani, 417 F.3d at 12).  "This test ensures that a district court exercises specific personal jurisdiction over only those foreign defendants who had 'fair warning that a particular activity may subject them' to U.S. jurisdiction."  Id. (quoting Mwani, 417 F.3d at 11).

There is a sufficiently "close nexus" among the U.S., Mossi's conduct, and CABEI's civil RICO claim to warrant exercising Rule 4(k)(2) jurisdiction here.  Mossi does not contest that he encouraged CABEI to host the EV conference, nor that the conference, which featured U.S. companies and at least one American diplomat, was designed to "encourage U.S. and regional stakeholders to further invest in the Central American EV industry."  Def. Mot. to Dismiss at 4 (quoting FAC ¶ 52).  Mossi concedes that he "followed up with participants," including Cenntro, to 'help facilitate' future business in the Central American market," and that CABEI purchased two Cenntro vehicles with its discretionary funds.  Id. (quoting FAC ¶ 53).  Mossi also admits that during his lame duck period as Executive President, he "correspond[ed] with dignitaries and businesspeople" in Central America, "as well as in 'New York,'" id. at 5

(citing FAC ¶¶ 64–72), which is at least facially consistent with CABEI's allegation that Mossi visited credit rating agencies in New York at the end of his tenure, FAC ¶ 77.  Accepting other uncontested, non-conclusory allegations in the complaint as true, Mossi traveled to New York and tried to "negatively influenc[e]" credit rating agencies' perceptions of CABEI before his term expired.  Id.  And, after separating from the Bank, he contacted one of CABEI's business partners in New York to cast aspersions on its new president, id. ¶ 94, which "caused the Bank to have to expend time and resources to conduct additional diligence calls on its upcoming bond offering, of which Mossi was fully aware, increasing CABEI's cost to do business," id. ¶ 95.  Given these contacts, the present lawsuit plainly does not "exclusively" involve "conduct that was undertaken" abroad.  Doe v. Buratai, 792 Fed. App'x 6, 9 (D.C. Cir. 2019).

Granted, Mossi denies that any of his conduct was unlawful.  But for present purposes, what matters is that these domestic actions constitute the key building blocks of CABEI's civil RICO claim.  Mossi purposefully directed his activities at the U.S. as a whole, seeking American investment in the Central American EV industry; developing a business relationship with a specific American company after the EV conference; and allegedly disparaging CABEI's reputation in American markets upon learning that he would not be serving another term as Executive President.  These activities gave immediate rise to CABEI's principal claim for relief, which distinguishes this case from those in which courts have found the relationship between a defendant's domestic activity and a plaintiff's claim for relief too attenuated.  See, e.g., Glycobiosciences, Inc. v. Vichy Lab'ys, S.A., No. 22-cv-1264, 2023 WL 157322, at *5 (D.D.C. Jan. 11, 2023) (declining to exercise 4(k)(2) jurisdiction over foreign company with single employee in a single office in the U.S., where plaintiff did not explain how this geographic presence was "connected to its claim of patent infringement").

There is also a direct connection between Mossi's conduct in the U.S. and the injuries alleged in the complaint, which include harm to CABEI's 2024 bond offering process and terms, as well as to the Bank's "business interests," "business relationships," and "business standing" in American markets. FAC ¶¶ 153–55. Two D.C. Circuit decisions help to clarify when the link between a defendant's conduct and a plaintiff's injury is sufficiently strong to support Rule 4(k)(2) jurisdiction. Mwani considered whether a district court had the power to hear various claims against Osama bin Laden and al Qaeda, which were brought by Kenyan plaintiffs who suffered injuries in a 1998 terrorist attack outside the American embassy in Nairobi. 417 F.3d at 4. The court upheld the exercise of Rule 4(k)(2) jurisdiction because bin Laden and al Qaeda had purposefully directed their terrorist activities at residents of the U.S. when they attacked the surroundings of the embassy, and the plaintiffs' injuries arose directly from those activities. Id. at 14. By contrast, in Bernhardt, the court rejected Rule 4(k)(2) jurisdiction where plaintiffs, family members of the victims of a 2009 al Qaeda attack on a secret CIA base in Afghanistan, sued a foreign bank that was alleged to have "facilitate[d] financial transactions" for "countries, institutions, and entities that formed part of a terrorism financing and support network" that supported al Qaeda. 47 F.4th at 863–66. The Bernhardt court reasoned that there were too many intermediaries between the bank and al Qaeda to substantiate a close connection between the bank's conduct and the plaintiffs' downstream injuries. Id.

Although the factual circumstances here are far less dire, this case is more like Mwani than Bernhardt. To the extent CABEI has suffered cognizable injuries under RICO, they are alleged to be direct consequences of Mossi's dealings, a significant portion of which occurred in the U.S. In other words, it is reasonable to infer that Mossi's courting of particular American companies to the exclusion of others, as well as his disparaging comments to U.S. credit rating

agencies and business partners, had a negative impact on CABEI's bond offering and its business interests in domestic markets.

Not all of CABEI's allegations substantiate its nationwide contacts argument, and some of its points are especially weak.[4]  The Court also appreciates that "[g]reat care and reserve should be exercised when extending . . . notions of personal jurisdiction into the international field."  Peters v. Estate of Qadhafi, No. 23-cv-516, 2024 WL 4603907, at *5 (D.D.C. Aug. 28, 2024) (quoting Fed. R. Civ. P. 4(k) advisory committee's note to 1993 amendments).  But no matter the weakness of some of CABEI's jurisdictional assertions and the delicacy of a case that spans international borders, Mossi has had sufficient minimum contacts with the U.S. as a whole. According to the complaint, he "deliberately engaged in activities in the United States with the intent of creating continuing [relationships] between [him]self and residents of the United States," while interfering with the Bank's relationships with American institutions.  Citadel Inv. Grp., LLC v. Citadel Capital Co., 699 F. Supp. 2d 303, 315 (D.D.C. 2010).  "[B]y seeking" his own relationships with U.S. actors and interfering with CABEI's, Mossi "had 'fair warning' that [his] activities would 'subject [him] to the jurisdiction' of the United States."  Id. (quoting Mwani, 417 F.3d at 13).

---

[4] For example, the fact that Mossi posted many of his critical statements about CABEI on American social media websites like X and LinkedIn does nothing to shore up personal jurisdiction.  "The 'mere accessibility'" of "Tweets in the United States" does not establish minimum contacts with this forum.  Safex Found., Inc., 694 F. Supp. 3d at 16 (quoting GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1350 (D.C. Cir. 2000)); see also Sweetgreen, Inc. v. Sweet Leaf, Inc., 882 F. Supp. 2d 1, 5–6 (D.D.C. 2012) (finding that Facebook and Twitter pages do not provide basis for exercising jurisdiction under D.C. long-arm statute).  To hold otherwise would be to suggest that a foreign defendant who uses an American social media platform could "almost always" be haled into "any [American] forum."  GTE New Media Servs., 199 F.3d at 1350.

b.  <u>Reasonableness Inquiry</u>

After <u>Fuld</u>, there is some question whether an "inquiry into the reasonableness of the assertion of jurisdiction" in any given case is "constitutionally required."  606 U.S. at 23 (quoting <u>Asahi</u>, 480 U.S. at 115).  The Court nevertheless considers whether the exercise of jurisdiction would be reasonable by assessing traditional factors, such as "[1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief." <u>Id.</u> at 24 (quoting <u>Asahi</u>, 480 U.S. at 113).

With respect to burden on the defendant, Mossi is a sophisticated international businessman with a home in the District of Columbia, and he regularly travels to the U.S. for long periods, whether for work, medical care, or leisure.  It is rather "implausible" that litigating this case in the U.S. would "force [him] to bear an unfair or unmanageable burden."  <u>Id.</u> (citation omitted).

As to the interests of the forum state, "this case involves enforcement of a federal statute protecting the United States' paramount sovereign interests" in addressing racketeering activity. <u>United States v. Philip Morris USA, Inc.</u>, 319 F. Supp. 2d 9, 13 (D.D.C. 2004).  True, neither party is an American resident, which—all else equal—might diminish this forum's interest in the dispute.  <u>See</u> <u>Asahi</u>, 480 U.S. at 114.  But without prematurely delving into the merits, it is worth underscoring that RICO may apply to "foreign racketeering activity," and "Congress did not limit [the statute] to domestic enterprises" so long as the enterprise has an "anchor" in "U.S. commerce" and the plaintiff proves domestic injury.  <u>RJR Nabisco v. Eur. Cmty.</u>, 579 U.S. 325, 340, 342, 344 (2016).  RICO case law bolsters the conclusion that, as a general matter, U.S. courts ought to remain available to redress the harms of racketeering activity even when such activity extends beyond American borders.  Though perhaps not as potent as the federal

government's "exceedingly compelling interest" in "providing a forum for American victims [of terrorism] to hold the perpetrators of such acts accountable," Fuld, 606 U.S. at 24, the U.S.'s sovereign interest in RICO's enforcement carries weight—especially where, as here, more-than-sufficient "contacts [with the U.S.] have been established," Asahi, 480 U.S. at 114.

Finally, CABEI has an interest in obtaining relief.  Again, the Bank has adequately pled that a substantial portion of Mossi's allegedly unlawful conduct occurred in the U.S., and the civil RICO statute establishes unique rights and remedies that cannot be vindicated elsewhere. Compare Asahi, 480 U.S. at 114 (concluding that plaintiff lacked an interest in obtaining relief in California where, among other things, it could litigate its indemnification claim in Taiwan or Japan), with Fuld, 606 U.S. at 24 (holding that "American plaintiffs have a strong interest in seeking justice through an [Anti-Terrorism Act] damages action in U.S. courts").

Mossi contends that this dispute would be more easily and efficiently litigated abroad. See Def. Supp. Br. in Resp. to Min. Order of June 23, 2025 at 6–9.  He points out that much evidence and testimony would be in Spanish; that his employment relationship with CABEI would be governed by foreign law; that litigating in the U.S. would "[o]bliterate [f]undamental [s]ubstantive [s]ocial [p]olicies" such as international comity; and that Central American fora have the "strongest connection" to this dispute.  Id.  As CABEI points out, these "arguments are all better suited for a *forum non conveniens* motion—one Mossi has never made."  Pl. Reply Br. Regarding the Court's Jurisdiction Over Def. at 5.  But to the extent convenience factors bleed into the personal jurisdiction analysis, see Asahi, 480 U.S. at 113 (quoting World-Wide Volkswagen v. Woodson, 444 U.S. 286, 292 (1980)), these factors do not tip the scales.[5]

_____

[5] As CABEI notes, Mossi's contention "that most of the evidence and testimony in this dispute will be in Spanish" is speculative at this juncture.  Pl. Reply Br. Regarding the Court's Jurisdiction Over Def. at 5 n.5.  In any case, U.S. courts regularly accept foreign-language

c.   Forfeited Rule 4(k)(2) Argument

At the motion to dismiss hearing, Mossi contended for the first time that the Court should not exercise Rule 4(k)(2) jurisdiction because doing so would be inconsistent with the federal law at issue in this case: the RICO Act.  See Fed. R. Civ. P. 4(k)(2)(B) (requiring that exercise of jurisdiction to be "consistent with the United States Constitution and laws").  Mossi points to RICO's venue and service section, which provides in relevant part that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a).  The D.C. Circuit has interpreted this provision to mean that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."  FC Inv. Grp. LC v. IFX Mkts., Ltd., 529 F.3d 1087, 1099 (D.C. Cir. 2008) (alterations removed) (quoting PT United Can Co. Ltd. v. Crown Cork & Seal Co., 138 F.3d 65, 70 (2d Cir. 1988)), overruled on other grounds by Erwin-Simpson v. AirAsia Berhad, 985 F.3d 883 (D.C. Cir. 2021).  Because Mossi lacks minimum contacts in D.C., he posits that the exercise of jurisdiction based on nationwide contacts would run afoul of the RICO Act.

Mossi's argument is unavailing.  "[I]n the absence of exceptional circumstances, 'arguments raised for the first time at oral argument are forfeited.'"  League of United Latin

_____

evidence and testimony and consider the bearing of foreign law on domestic disputes, so the fact that some of the challenged conduct took place abroad and in a different language is not dispositive.

Exercising personal jurisdiction over Mossi also does not threaten to contravene principles of international comity in a case like this one, since Mossi has substantial, claim-related connections with the U.S. as a whole, and the substantive guardrails erected by the RICO statute (e.g., its domestic injury requirement) mitigate the "danger of international friction."  RJR Nabisco, 579 U.S. at 348.

Amer. Cit. v. Exec. Off. of the Pres., 780 F. Supp. 3d 135, 197 (D.D.C. 2025) (quoting U.S. ex

rel. Davis v. District of Columbia, 793 F.3d 120, 127 (D.C. Cir. 2015)).  At the hearing, Mossi's

counsel conceded that this 4(k)(2) argument had not been raised in his briefs, attributing the

omission to uncertainty in the post-Fuld doctrinal landscape.  Although Fuld represents an

important intervening change in due process case law, it does not "excuse" Mossi's "failure to

raise" an argument that was undoubtedly available to him before that decision was issued.

League of United Latin Amer. Cit., 780 F. Supp. 3d at 197.  Because Mossi "could have made"

this argument in his initial motion-to-dismiss briefing or even after Fuld in his two supplemental

briefs, but "elected not to do so," the point is forfeited.  GSS Grp. Ltd v. Nat'l Port Auth., 680

F.3d 805, 812 (D.C. Cir. 2012).

      The Court doubts that Mossi's new argument holds water, in any case.  Per FC Inv. Grp.,

"RICO does not provide an *independent* basis for personal jurisdiction" where no defendant has

minimum contacts with the forum district, and no other jurisdictional hook is available.  Globe

Metallurgical, Inc. v. Rima Indust. S.A., 177 F. Supp. 3d 317, 330 (D.D.C. 2016) (emphasis

added); see also Gligorov v. Nation of Brunei, No. 21-cv-1773, 2023 WL 1438326, at *3

(D.D.C. Jan. 31, 2023) (citing Collingsworth v. Drummond Co. Inc., No. 19-cv-1263, 2020 WL

2800612, at *7 n.4 (D.D.C. May 29, 2020), aff'd, 839 F. App'x 567 (D.C. Cir. 2021)) ("Merely

invoking [§ 1965] does not confer personal jurisdiction.").  But that does not mean it is

*inconsistent* with RICO to exercise jurisdiction within the narrow guardrails of Rule 4(k)(2)—

*i.e.*, where a foreign defendant has substantial contacts with the U.S. as a whole but would

otherwise evade the exercise of jurisdiction for lack of contacts with any one district.  RICO's

nationwide service provision should not be read to "provide for nationwide personal jurisdiction

over every defendant in every civil RICO case, no matter where the defendant is found."  FC Inv.

Grp., 529 F.3d at 1099 (quoting PT United Can Co., 138 F.3d at 70).  But it would be just as
perverse to read the statute to preclude the exercise of personal jurisdiction over a foreign
defendant who avails himself of the entire country, rather than any particular forum.  Section
1965 is meant to channel RICO cases in a way that "avoid[s], where possible, haling defendants
into far flung fora," id. at 1100, not to effectively insulate foreign defendants from liability by
preventing them from being haled into *any* U.S. forum.  It is therefore unsurprising that Mossi
furnishes no authority to support his eleventh-hour argument.

* * *

In conclusion, Mossi "is not subject to the jurisdiction of any single state court," and "the
exercise of federal jurisdiction here is consistent with the Constitution (and laws) of the United
States."  Mwani, 417 F.3d at 10.  The requirements of Rule 4(k)(2) having been satisfied, the
Court may exercise personal jurisdiction over Mossi.

### B.  Civil RICO Claim

The Court next turns to the merits of CABEI's lone federal claim, which alleges that
Mossi violated the RICO Act.  See 18 U.S.C. § 1962(c).  "A violation of § 1962(c) of the RICO
Act consists of four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity.'"  W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square
Assocs., 235 F.3d 629, 633 (D.C. Cir. 2001) (quoting Pyramid Secs. Ltd. v. IB Resol., Inc., 924
F.2d 1114, 1117 (D.C. Cir. 1991)).  To show a "pattern of racketeering activity," a plaintiff must
identify at least two predicate racketeering offenses over a ten-year period.  Id. (citing 18 U.S.C.
§ 1961(5)).  The predicate offenses must be "related" and "amount to or pose a threat of
continued criminal activity."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).  A civil
RICO plaintiff must also prove that the defendant caused a "domestic injury to business or

property," as the RICO Act "does not allow recovery for foreign injuries."  <u>RJR Nabisco</u>, 579 U.S. at 354.

CABEI falls well short of plausibly alleging that Mossi violated the RICO Act.  First, the complaint fails to provide facts supporting the allegation that Mossi formed an "enterprise." Second, the complaint does not adequately allege the predicate offenses of wire fraud and Hobbs Act extortion.  Third, the predicate offenses—even if adequately alleged—do not constitute a "pattern" of racketeering activity.[6]

### 1. *Racketeering "Enterprise"*

The complaint accuses Mossi of operating an "enterprise" engaged in racketeering activity.  <u>See</u> FAC ¶¶ 123–25.  The RICO Act provides that an enterprise may "include[] any individual, partnership, corporation, association, or other legal entity," as well as "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4); <u>see also</u> <u>Boyle v. United States</u>, 556 U.S. 938, 944 (2009) (recognizing that "[t]he term 'any' ensures that the definition has a wide reach").

CABEI alleges that Mossi, SOLMECA, and Cenntro formed an "association in fact." FAC ¶ 8.  An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  <u>Boyle</u>, 556 U.S. at 946 (quoting <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981)).  This type of enterprise "must have three structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'"  <u>United States v. Eiland</u>, 738 F.3d 338, 360 (D.C. Cir. 2013) (quoting <u>Boyle</u>, 556 U.S. at 946).  "Put differently, to

---

[6] Because the RICO claim fails on several alternative grounds, the Court does not address whether Mossi's alleged racketeering offenses caused CABEI to suffer an injury in the United States.  <u>See</u> <u>RJR Nabisco</u>, 579 U.S. at 354; <u>Yegiazaryan v. Smagin</u>, 599 U.S. 533, 542 (2023).

successfully state a claim under RICO, a plaintiff must plead facts 'identifying the common

purpose and organizational and decisionmaking structure of the alleged enterprise.'" Stankevich

v. Kaplan, 156 F. Supp. 3d 86, 94 (D.D.C. 2016) (quoting Dodd v. Infinity Travel, 90 F. Supp.

2d 115, 117 (D.D.C. 2000)), aff'd, 707 F. App'x 717 (D.C. Cir. 2017).  CABEI's complaint fails

to make this showing.

     First, consider Cenntro's purported involvement in the "enterprise."  The complaint never

suggests that Mossi and Cenntro "'joined together' to achieve an alleged illegal purpose."  US

Dominion, Inc. v. MyPillow, Inc., No. 21-cv-445, 2022 WL 1597420, at *5 (D.D.C. May 19,

2022).  Nor does it allege that Cenntro "communicated, met, or otherwise coordinated" with

Mossi "in furtherance of" defrauding CABEI.  Id.; see also Cruz v. FXDirectDealer, LLC, 720

F.3d 115, 120 (2d Cir. 2013) (noting that the individuals in an association in fact "must share a

common purpose to engage in a particular fraudulent conduct and work together to achieve such

purposes" (citation omitted)); Al-Rayes v. Willingham, 914 F.3d 1302, 1308 (11th Cir. 2019)

(concluding that "the relevant 'purpose' in an association-in-fact enterprise is the members'

shared purpose of engaging in illegal activity—not the purpose for which they initially became

acquainted").  Instead, the complaint only claims that Mossi used CABEI's good will and

resources to "broker deals" benefitting himself and Cenntro.  FAC ¶¶ 123, 138–39.  In its

response to Mossi's motion to dismiss, CABEI even concedes that it "does not know if Cenntro

knowingly aligned itself with Mossi's illegal conduct and illegal goals for the enterprise[.]"  Pl.

Opp'n to Mot. to Dismiss at 27.[7]  Without factual allegations showing "a common purpose . . . to

---

[7] The Bank submits that Cenntro need not be a "knowing or culpable participant" in the enterprise, as it could be an "innocent vehicle" for Mossi's racketeering activities.  Pl. Opp'n to Mot. to Dismiss at 27 (quoting United States v. Philip Morris USA Inc., 566 F.3d 1095, 1111 (D.C. Cir. 2009)).  But Philip Morris stated that the enterprise itself—not its members—may be "the innocent vehicle through which unlawful activity is carried out."  566 F.3d at 1111; see also

participate in any" of the predicate racketeering offenses, the Amended Complaint fails to allege

that Cenntro was part of an "enterprise" with Mossi and SOLMECA.  Cisneros v. Petland, Inc.,

972 F.3d 1204, 1213 (11th Cir. 2020).

Second, consider the remaining participants in the "enterprise": Mossi and SOLMECA.

To adequately plead a cause of action under § 1962(c), CABEI must allege that the members of

the enterprise "conducted or participated in the conduct of the 'enterprise's affairs,' not just their

own affairs."  Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  That is, the participants'

actions must be "undertaken on behalf of the enterprise as opposed to on behalf of [the

participants] in their individual capacities, to advance their individual self-interests."  United

Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co., 719

F.3d 849, 854 (7th Cir. 2013).  The complaint fails to make this distinction.  Instead, it states that

Mossi's acts of wire fraud and extortion "have a singular goal: to enrich [Mossi] at CABEI's

expense[.]"  FAC ¶ 8; see also id. ¶ 124 ("Mossi organized SOLMECA to consummate Mossi's

scheme to derive wrongful profits from his association with Cenntro and take business

deals . . . that he really set up to profit himself once he left the Bank.").  By failing to "adequately

plead[] that [Mossi] conducted the affairs of the enterprise as opposed to [his] own individual

affairs," the complaint fails to allege the existence of an "enterprise" under the RICO Act.  Feld

---

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001) ("RICO both protects a
legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protects
the public from those who would unlawfully use an 'enterprise' (whether legitimate or
illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" (alteration in
original) (citation omitted)).

Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals, 873 F. Supp. 2d 288, 314 (D.D.C. 2012).[8]

### 2. Predicate Racketeering Offenses

Next, CABEI must plausibly allege that Mossi engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). As noted above, a "pattern of racketeering activity" requires "the commission of at least two predicate racketeering offenses over a ten year period." Tr. Agreement of Steven M. Sushner v. C.A. Harrison Companies, LLC, No. 22-cv-2837 (CRC), 2023 WL 6313507, at *6 (D.D.C. Sep. 28, 2023) (citation omitted); 18 U.S.C. § 1961(5). The complaint asserts that Mossi committed wire fraud and Hobbs Act extortion, both of which are enumerated racketeering offenses under the RICO Act. See 18 U.S.C. § 1961(1)(B). However, the complaint fails to sufficiently allege either predicate offense.

### a. Wire Fraud

The complaint alleges that during his tenure as Executive President, Mossi committed multiple acts of wire fraud by "misus[ing] the Bank's resources for his own benefit." FAC ¶ 138. Specifically, Mossi purportedly used CABEI's funds and good will to sponsor an EV conference in D.C., purchase two EVs from Cenntro on CABEI's behalf, and indicate that CABEI would finance or subsidize the purchase of additional Cenntro EVs. See id. ¶¶ 138–42.

"The wire fraud statute criminalizes 'scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" Ciminelli v. United States, 598 U.S. 306, 312 (2023) (alterations in original) (quoting 18 U.S.C.

---

[8] It is also unclear how, if at all, SOLMECA participated in the purported enterprise. Mossi's purported acts of wire fraud—i.e., his "misuse [of] the Bank's resources for his own benefit" while serving as its Executive President, FAC ¶ 138—occurred before he incorporated SOLMECA, id. ¶ 8. And the complaint does not allege any facts suggesting that SOLMECA was involved in Mossi's extortion of CABEI. See generally id. ¶¶ 126–137.

§ 1343).  The "essential elements" of wire fraud are "(1) a scheme to defraud, and (2) use of . . . wires for the purpose of executing the scheme."  Johnson v. Comput. Tech. Servs., Inc., 670 F. Supp. 1036, 1039 (D.D.C. 1987) (quoting United States v. Alston, 609 F.2d 531, 536 (D.C. Cir. 1979)).  When alleging wire fraud as a predicate RICO offense, a plaintiff must satisfy the heightened pleading standard of Rule 9(b).  See Bates v. Nw. Hum. Servs., Inc., 466 F. Supp. 2d 69, 88 (D.D.C. 2006).  "Typically, that means 'stat[ing] the time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud.'"  Sandza v. Barclays Bank PLC, 151 F. Supp. 3d 94, 108 (D.D.C. 2015) (alterations in original) (quoting Bates, 466 F. Supp. 2d at 89); see W. Assocs., 235 F.3d at 637 ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." (citation omitted)).

Critically, the wire fraud statute "reaches only traditional property interests."  Ciminelli, 598 U.S. at 316.  It does not protect "intangible interests unconnected to traditional property rights."  Id. at 312 (citing Skilling v. United States, 561 U.S. 358, 400 (2010)).  But here, the complaint contends that Mossi deprived CABEI only of intangible "business opportunities" by "divert[ing] those opportunities to himself."  Pl. Opp'n to Mot. to Dismiss at 31; see FAC ¶¶ 62 ("Mossi necessarily let languish CABEI's opportunities to further develop its business with more established EV companies, thereby doing harm to CABEI's business interests in the domestic EV market."), 147 ("While Mossi purported to be developing the relationship with Cenntro for CABEI's benefit, he was in fact developing it for his own benefit, and CABEI did not benefit from it at all."), 154 ("Mossi as part of his pattern of racketeering squandered CABEI's opportunity to enter into an Action Plan with the USTDA, which has caused CABEI to lose

significant business opportunities in the United States.").  And even if "business opportunities" were traditional property interests protected by the wire fraud statute, the complaint never alleges with particularity what those opportunities were.  See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994) (noting that under Rule 9(b), a plaintiff must state "what was retained or given up as a consequence of the fraud" (citation omitted)).  CABEI's broad gesture toward unspecified prospects of future deals with Tesla or other American EV companies does not suffice.  See FAC ¶ 147.  Because the complaint does not allege specific facts showing that Mossi fraudulently "obtain[ed]" CABEI's "money or property," it fails to allege that he committed wire fraud under § 1343.  Kousisis v. United States, 145 S. Ct. 1382, 1392 (2025).[9]

Perhaps recognizing this deficiency, CABEI raises a new claim in its briefing:  Because Mossi deprived CABEI of a "fiduciary duty . . . through a wire fraud scheme," says the Bank, he committed "honest-services fraud."  Pl. Opp'n to Mot. to Dismiss at 32; see 18 U.S.C. § 1346 (defining "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services").  In an honest services fraud scheme, the victim "suffer[s] no deprivation of money or property; instead, a third party, who ha[s] not been deceived, provide[s] the enrichment."  United States v. Avenatti, 81 F.4th 171, 193–94 (2d Cir. 2023) (alterations in original) (citation omitted), cert. denied, 144 S. Ct. 2598 (2024).

_____

[9] In its briefing, CABEI makes a cursory reference to the fact that while Mossi was executing the alleged wire fraud scheme, he was "drawing down a salary" and "having CABEI . . . financ[e] EV purchases from Cenntro."  Pl. Opp'n to Mot. to Dismiss at 31.  But the _use_ of money in the scheme does not satisfy § 1343's "money or property" requirement.  Rather, the complaint must allege that "money or property [was] an _object_ of the defendant's fraud."  Kousisis, 145 S. Ct. at 1391 (noting that "the traditional property interest at issue 'must play more than some bit part in a scheme'" (citation omitted)).  The complaint confirms that the object of Mossi's purported scheme was intangible.  See FAC ¶ 138 (alleging that Mossi's wire fraud was "designed to set up for himself a lucrative exit opportunity for Mossi and his company SOLMECA").

But § 1346 only criminalizes conduct involving bribery or kickbacks.  See Skilling, 561 U.S. at 408–09.  The complaint nowhere alleges a "bribery" or "kickback" agreement between Mossi and Cenntro, the "third party" purportedly benefitting from Mossi's honest services fraud.  See Pl. Opp'n to Mot. to Dismiss at 27 ("CABEI does not know if Cenntro knowingly aligned itself with Mossi's illegal conduct and illegal goals for the enterprise[.]").  Thus, CABEI's leap to an honest services fraud theory falls short.

In sum, CABEI submits that Mossi's decisions during his tenure as Executive President were a "misuse [of] the Bank's resources for his own benefit."  FAC ¶ 138.  But because the complaint does not plausibly allege that Mossi deprived CABEI of a "traditional property interest" or arranged a bribery or kickback scheme with Cenntro, it fails to state a claim of wire fraud.

### b.   Hobbs Act Extortion

The second alleged RICO predicate offense is Hobbs Act extortion.  The Hobbs Act prohibits the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(a), (b)(2).  A defendant thus commits Hobbs Act extortion if "(1) the defendant knowingly and deliberately obtained or attempted to obtain property from another with that person's consent; (2) the defendant did so by wrongful use of actual or threatened fear, or under color of official right; and (3) the defendant's conduct affected interstate commerce."  United States v. Edwards, 324 F. Supp. 2d 10, 12 (D.D.C. 2004).

CABEI claims that Mossi made a series of false statements disparaging CABEI in an effort to pressure the Bank to settle his claims before the Central American Court of Justice.  See FAC ¶ 127 ("Mossi has engaged in attempted extortion through the wrongful use of economic

fear to obtain . . . a lucrative settlement from CABEI to buy his silence[.]").  But the complaint

never plausibly alleges that Mossi *threatened* to continue making false statements unless CABEI

paid him.  That is, there are no facts suggesting that Mossi used "actual or threatened . . . fear" to

obtain a settlement.  18 U.S.C. § 1951(b)(2).  Instead, the complaint makes the conclusory

assertion that Mossi made it "clear" that his $2,375,810 demand in his "sham claim" before the

Central American Court of Justice was the "price" for "silenc[ing] him."  FAC ¶ 135.  Without

more, this is a "'naked assertion[]' devoid of 'further factual enhancement.'"  Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)); see

Kowal, 16 F.3d at 1276 (noting that courts "need not accept inferences drawn by plaintiffs if

such inferences are unsupported by the facts set out in the complaint").

 In its briefing, CABEI makes no attempt to bridge this gap in its pleading.  It first

submits—again without factual support—that Mossi's arbitration demand before the Central

American Court of Justice was payment "to cease . . . sharing highly confidential and proprietary

information that he learned during his time" at the Bank.  Pl. Opp'n to Mot. to Dismiss at 33.  It

then seems to suggest that Mossi's claim before that tribunal is *itself* a form of extortion because

it is "without colorable entitlement" and lacks a "nexus to his demands for compensation."  Id.;

see also id. at 35 ("[S]ham litigation that purports to seek an 'utter[ly] implausib[le]' amount of

money still constitutes 'extortion.'" (second and third alterations in original) (quoting Avenatti,

81 F.4th at 185–86)).  However, courts in this district have repeatedly held that "[a]busive or

sham litigation does not constitute a RICO predicate act."  E. Sav. Bank, FSB v. Papageorge, 31

F. Supp. 3d 1, 13 (D.D.C. 2014) (collecting cases), aff'd, 629 F. App'x 1 (D.C. Cir. 2015); see

Republic of Kazakhstan v. Stati, 380 F. Supp. 3d 55, 61 (D.D.C. 2019) ("Numerous other circuit

courts and district courts across the country have concluded that wrongful litigation activities

cannot serve as RICO predicate acts."). Even if the Court accepts that Mossi "engaged in a single frivolous, fraudulent, or baseless lawsuit," the arbitration demand itself cannot "constitute a viable RICO predicate act." Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018).

CABEI's reliance on Avenatti is unavailing. In that case, an attorney made two demands during settlement negotiations with a third party: a $1.5 million payment for his client, and a $15–25 million retainer agreement for himself. 81 F.4th at 178–81, 186. Critically, the attorney told the third party that "if his two demands were not promptly met," he would publicize a "scandal" that would harm the third party's reputation. Id. at 179. The Second Circuit concluded that a "reputational threat" can amount to attempted Hobbs Act extortion if there is no "nexus between a claim of right and either the thing demanded or the reputational threat used to support that demand." Id. at 186. Because the attorney's demand for the retainer agreement "lacked the necessary nexus to [his client's] own claim of right," there was sufficient evidence to convict him of extortion. Id. at 189.

Here, by contrast, there are no plausible allegations that Mossi threatened to release damaging or non-public information about CABEI unless the Bank paid his claim before the Central American Court of Justice. And Mossi's threats to file a "sham legal proceeding against CABEI" cannot, standing alone, serve as a RICO predicate act. US Dominion, 2022 WL 1597420, at *6 (recognizing that cease-and-desist letters threatening litigation constitute "litigation-related activity" that do not give rise to a RICO claim). Thus, the complaint fails to adequately plead that Mossi committed Hobbs Act extortion.

### 3. "Pattern" of Racketeering Activity

Even if CABEI adequately alleged that Mossi committed two or more predicate racketeering offenses, it must also show that his actions formed a "pattern." 18 U.S.C.

§ 1962(c).  To constitute a "pattern," the predicate acts must be "related" and "continuous."  H.J. Inc., 492 U.S. at 239–43.  Predicate acts are "related" if they share "similar purposes, results, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics."  W. Assocs., 235 F.3d at 633 (quoting H.J. Inc., 492 U.S. at 240); see Lu v. Lezell, 45 F. Supp. 3d 86, 97 (D.D.C. 2014) (noting that the relatedness requirement is "not a cumbersome one for a RICO plaintiff" (citation omitted)).  To demonstrate "continuity," the plaintiff must establish a "'closed period of repeated conduct' or a threat of future criminal activity."  W. Assocs., 235 F.3d at 633 (quoting H.J. Inc., 492 U.S. at 241).

The D.C. Circuit has provided additional "guidance on the nebulous issue of what constitutes a pattern of racketeering activity."  Id.  Specifically, six factors govern this Court's analysis of whether the defendant's actions formed a pattern: "[1] the number of unlawful acts, [2] the length of time over which the acts were committed, [3] the similarity of the acts, [4] the number of victims, [5] the number of perpetrators, and [6] the character of the unlawful activity."  Tr. Agreement, 2023 WL 6313507, at *8 (alterations in original) (quoting Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995)).  These factors "do[] not establish a rigid test, but rather present[] a flexible guide for analyzing RICO allegations on a case by case basis."  W. Assocs., 235 F.3d at 634.  "In some cases, however, some factors will weigh so strongly in one direction as to be dispositive."  Edmondson & Gallagher, 48 F.3d at 1265.

Here, the latter three factors weigh heavily—and dispositively—against CABEI's claim that Mossi engaged in a continuous pattern of racketeering activity.  First, CABEI is alleged to

be the only victim, and Mossi the only perpetrator.[10]  The alleged acts of wire fraud and extortion were "directed at one [entity] with no potential to extend to other persons or entities."  SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir. 1990); see also Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) (concluding that the plaintiffs failed to satisfy the continuity requirement because the defendants' actions were "directed towards a single fraudulent goal," "involved a limited purpose," "involved but one perpetrator," "involved but one set of victims," and "took place over approximately one year"); Busby v. Cap. One, N.A., 772 F. Supp. 2d 268, 282 (D.D.C. 2011) (holding that the plaintiff failed to allege a "pattern" of racketeering activity because "the plaintiff has identified no similar actions taken by the defendants against any other" victims).

Second, the "character of the alleged racketeering activity" is out of step with the type of schemes the RICO Act was designed to combat.  W. Assocs., 235 F.3d at 236.  The RICO Act's pattern requirement "helps to prevent ordinary business disputes from becoming viable RICO claims."  Id. at 637.  But the allegations in the complaint are ultimately grounded in a fairly pedestrian business dispute (or, perhaps more accurately, a business feud):  An aggrieved former employee purportedly "abused his position" while in office, "breached the duty of confidentiality" after he left, and filed claims against his employer for his troubles.  FAC ¶¶ 7, 186.  Thus, CABEI failed to allege a "pattern" of racketeering activity under the RICO Act.  See Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 75 (D.D.C. 2009) (declining to find a

---

[10] CABEI submits that there are multiple victims because Mossi's conduct harmed each of CABEI's fifteen member countries.  See Pl. Opp'n to Mot. to Dismiss at 39.  But "[b]y alleging harm to each individual member . . . [CABEI] has . . . artificially subdivided an aspect of its allegations in a transparent effort to make [Mossi's] alleged fraudulent conduct seem more expansive."  W. Assocs., 235 F.3d at 635; see also Harpole Architects, P.C. v. Barlow, 668 F. Supp. 2d 68, 75 (D.D.C. 2009).

"pattern" of racketeering activity when the defendant "committed a limited number of similar

acts as part of a single scheme to steal from . . . her employer").[11]

---

[11] The remaining factors do not pull strongly enough in the other direction. <u>See</u> <u>Edmondson & Gallagher</u>, 48 F.3d at 1265 ("The number of alleged predicate acts . . . and the most generous estimate of the length of time the acts continued . . . are not enough to overwhelm the . . . narrowing factors."). First, by CABEI's count, Mossi engaged in "at least nine counts of wire fraud" and an extortion scheme. Pl. Opp'n to Mot. to Dismiss at 38. But even alleging "'dozens' of acts may not be enough to outweigh the other <u>Edmonson</u> factors." <u>Harpole</u> <u>Architects</u>, 668 F. Supp. 2d at 75 n.1 (citing <u>W. Assocs.</u>, 235 F.3d at 635–37). Second, the Bank submits that Mossi's wire fraud occurred "over the course of a year," and his subsequent extortion "began in December 2023 and persists to the present day." Pl. Opp'n to Mot. to Dismiss at 38–39. However, courts in this circuit have declined to find a "pattern" of racketeering activity even when the defendant acted over a longer period of time. <u>See, e.g.</u>, <u>W.</u> <u>Assocs.</u>, 235 F.3d at 635–36 (eight years); <u>Edmondson & Gallagher</u>, 48 F.3d at 1265 (three years); <u>Harpole Architects</u>, 668 F. Supp. 2d at 75 (three years).

## IV.   Conclusion

Although the Court has personal jurisdiction over Mossi under Rule 4(k)(2), CABEI's
RICO claim stumbles at nearly every turn.  The complaint does not plausibly allege the existence
of an enterprise, the predicate acts of wire fraud and Hobbs Act extortion, or a "pattern" of
racketeering activity.  Because the complaint has failed to state a civil RICO claim, CABEI
cannot establish federal subject matter jurisdiction.  The Court will thus dismiss the Bank's
RICO claim with prejudice and dismiss the non-RICO claims without prejudice so that it may
refile those claims in the appropriate court.  See Watson v. Faris, 139 F. Supp. 3d 456, 461
(D.D.C. 2015); Bridges v. Lezell L., PC, 842 F. Supp. 2d 261, 267 (D.D.C. 2012); see also Kyle
v. Bedlion, 177 F. Supp. 3d 380, 400 (D.D.C. 2016) (noting that "no unfairness attaches to"
dismissing state-law claims without prejudice, as 28 U.S.C. § 1367(d) "tolls the statute of
limitations during the pendency of the federal case and for at least 30 days thereafter" (citation
omitted)).  A separate order accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:  September 25, 2025